THOMPSON/CENTER ARMS COMPANY, A DIVISION OF THE K.W. THOMPSON TOOL COMPANY, INC., Plaintiff–Appellant,

v.

The UNITED STATES, Defendant–Appellee.

No. 90–5091.

United States Court of Appeals, Federal Circuit.

Jan. 30, 1991.

Rehearing Denied March 29, 1991.

Stephen P. Halbrook, Fairfax, Va., argued, for plaintiff-appellant.

Calvin C. Curtis, Dept. of Justice, Washington, D.C., argued, for defendant-appellee. With him on the brief were Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen and Gilbert S. Rothenberg.

Before RICH, MAYER, and MICHEL, Circuit Judges.

## OPINION

MAYER, Circuit Judge.

Thompson/Center Arms Company, a division of the K.W. Thompson Tool Company, Inc. (Thompson), appeals the judgment of the United States Claims Court dismissing its tax refund complaint. *See* 19 Cl.Ct. 725 (1990). We reverse.

### Background

Thompson is a federally licensed sporting arms manufacturer. It has designed and manufactures for hunting, target shooting, and other sporting purposes a single shot pistol with a 10 inch barrel called a "Contender". For a brief period in 1985, Thompson also manufactured a "Contender Carbine Kit" consisting of a 21 inch barrel, a wooden fore-end, and a shoulder stock. Other manufacturers had been selling similar conversion kits for the Contender since the late 1960s. Using Thompson's kit and the receiver of the Contender pistol, a purchaser can convert the pistol to a single shot carbine rifle with either a 21 inch or 10 inch barrel. The kit instructions, packaging, and advertising contain detailed warnings that making a carbine rifle with the 10 inch barrel is a violation of federal law. In addition, Thompson printed the phrase "Warning. Federal Law prohibits use with barrel less than 16 inches" on each carbine shoulder stock.

Thompson included the warnings on the advice of Rex Davis, in 1971 the Acting Director of the Alcohol, Tobacco, and Firearms Division of the Internal Revenue Service in the Department of the Treasury (ATF). In January of 1971, Thompson's president had written ATF and asked whether it would be legal to use the Contender pistol receiver with an 18 inch barrel and full shoulder stock to make a single shot carbine. Davis replied that "the manufacture of a carbine ... by utilizing a pistol action[ ] would be legal and the firearm so produced would not come within the purview of the National Firearms Act [26 U.S.C. §§ 5801–72 (1988) ]." However, he suggested that "it would be in the public interest" for Thompson to include warnings like those accompanying the Contender carbine kit.

Thompson interpreted Davis's opinion as encompassing its Contender pistol and carbine conversion kit. The agency interpreted it differently. Shortly after Thompson began producing its kit in 1985, the Director of the Bureau of Alcohol, Tobacco and Firearms (BATF, formerly ATF), informed it that the kit and pistol together were a firearm subject to the National Firearms Act. In BATF's opinion, possession of an unassembled kit with a Contender pistol was the same as possession of "a rifle having a barrel or barrels less than 16

inches in length," which section 5845(a)(3) of the Act defines as a "firearm" and to which the $200 "making" tax of section 5821 therefore applies. *See* 26 U.S.C. §§ 5821, 5845 (1988). However, BATF conceded that a complete 21 inch carbine rifle and complete pistol—each with its own receiver—do not come within the Act unless *actually assembled* as a "firearm", like a short-barreled "rifle", defined in section 5845.

When BATF adhered to this position on reconsideration, Thompson stopped producing the Contender carbine kit and filed suit in federal district court seeking a declaratory judgment that the pistol and kit were not a "firearm" as defined in the National Firearms Act. The court dismissed for lack of subject matter jurisdiction, noting that Thompson had to pay the disputed tax and file an administrative claim for refund before suing for a refund. *Thompson/Center Arms Co. v. Baker*, 686 F.Supp. 38, 43 (D.N.H.1988). Thompson subsequently paid the section 5821 tax and filed a refund claim with BATF. When BATF failed to act on the claim for more than six months, Thompson invoked the Tucker Act, 28 U.S.C. § 1491 (1988), and sued for a refund in the Claims Court. On cross motions for summary judgment, the court agreed with BATF: the Contender pistol, when possessed in conjunction with the carbine kit, is a "firearm" as defined in section 5845(a)(3). 19 Cl.Ct. at 731. Accordingly, it dismissed the complaint and Thompson appeals.

### Discussion

Section 5821 of the National Firearms Act (NFA or Act) requires any person making a firearm to pay a $200 tax on each. 26 U.S.C. § 5821 (1988). The question in this case is who "makes" a NFA "firearm" and therefore is liable for the tax[1]: Thompson, when it separately manufactures the Contender pistol and carbine con-

version kit, or the person possessing both a pistol and kit, when and if he actually assembles a 10 inch rifle? In our view, the National Firearms Act answers, "the latter."

### A. The Current Act

26 U.S.C. § 5845(a) (1988) defines "firearm" to include "(3) a rifle *having* a barrel or barrels of less than 16 inches in length; (4) a weapon *made* from a rifle if such weapon ·as *modified* has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length." *Id.* (emphasis added). The emphasized words strongly suggest that, to meet either definition, a short-barreled rifle[2] actually must be assembled. Congress knows the difference between *"could* have," *"could* be made," and *"could* be modified," on the one hand, and the terms and phrases it chose to use, on the other.

Section 5845(c) supports this common-sense interpretation. It defines "rifle" as:

> a weapon <u>designed</u> or redesigned, <u>made</u> or remade, and <u>intended</u> to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be <u>readily restored</u> to fire a fixed cartridge.

Again the underscored words suggest that a rifle meeting this definition must physically exist. In particular, the ordinary meaning of "restore" is to put back in a pre-existing condition. *Webster's Third New International Dictionary* 1936 (17th ed. 1976). One cannot restore to rifle form, readily or otherwise, a separate pistol and carbine conversion kit that previously have not been combined.

The statutory definition of "make" also supports this interpretation. "The term

---

1. The Act imposes several other requirements on persons making or dealing in firearms, but none is relevant here. *See* 26 U.S.C. §§ 5801 (occupational tax), 5811 (transfer tax), 5841 (firearms registration); *see also* 686 F.Supp. at 39.

2. We use the term "short-barreled rifle" to describe a weapon meeting the definition in either section 5845(a)(3) or (a)(4). *Cf.* 18 U.S.C. § 921(a)(8) (Gun Control Act definition of "short-barreled rifle").

'make', and the various derivatives of such word, shall include manufacturing ..., putting together, altering, any combination of these, or otherwise producing a firearm." 26 U.S.C. § 5845(i). The import is clear: a statutory firearm must exist in fact, not in contemplation, to be "made" within the meaning of the statute. *How* a firearm is "made" is irrelevant; that it exist is not. *Cf. United States v. Drasen*, 845 F.2d 731, 736–37 (7th Cir.1988). Of course, the term "make" can be modified by "could" or similar language indicating that the potential or likely existence of a firearm is enough. But Congress did not use that language in defining "rifle".

Finally, section 5822 suggests that Congress expected individual persons, in some circumstances, to make firearms subject to the Act. It provides that no person shall make a firearm unless he has filed with the Secretary of the Treasury an application to make and register the firearm and has "identified himself in the application form in such manner as the Secretary may by regulations prescribe, except that, if such person is an individual, the identification must include his fingerprints and his photograph." 26 U.S.C. § 5822. In our view, this provision contemplates the individual owner of a Contender pistol and carbine conversion kit who actually makes a short-barreled rifle, no less than the owner of an otherwise legal and unregulated long rifle or shotgun who saws off the barrel. *See, e.g., United States v. Rose*, 695 F.2d 1356 (10th Cir.1982).

Our reading of the Act is not a hyper-technical, excessively stingy construction that ignores or frustrates the statutory scheme. On the contrary, interpreting the definitions of "firearm" and "rifle" to encompass an unassembled collection of parts that *could* be made into a proscribed short-barreled rifle renders statutory language defining other types of "firearms" either awkward or superfluous. For example, Congress used the phrase "readily restored" in defining not only "rifle", but "machinegun", "shotgun", "any other firearm", and "unserviceable firearm" as well. *See* 26 U.S.C. § 5845(b), (d), (e), and (h). It deliberately did not use the phrase in the definition of "destructive device", choosing instead to use the broader phrase "readily converted". *Id.* § 5845(f). We can find no principled difference between "restored", as interpreted by the government, and "converted", as commonly understood: to change from one (unregulated) form into another (regulated) form. *Webster's Third New International Dictionary* 499. Therefore, to adopt the government's construction of the term "rifle" requires us to read out of the statute either the word "converted" in section 5845(f) or the word "restored" in section 5845(b)-(e) and (h). We see no justification for this, especially when according the words their ordinary meanings makes the most sense of the statute.

More importantly, interpreting the definition of "rifle" to cover the unassembled combination of a Contender pistol and carbine conversion kit makes "combination of parts" language elsewhere in the statute superfluous. For example, section 5845(b) defines "machinegun" to include "any *combination of parts* from which a machinegun *can be assembled* if such parts are in the possession or under the control of a person." 26 U.S.C. § 5845(b) (emphasis added). Section 5845(f) similarly defines "destructive device" as "any *combination of parts* either designed or intended for use in converting any device into a destructive device ... and from which a destructive device *may be readily assembled.*" *Id.* § 5845(f) (emphasis added). Finally, section 5845(a)(7) defines "firearm silencer" (by reference to section 921(a)(24) of the Gun Control Act of 1968, 18 U.S.C. §§ 921–930) to include "any *combination of parts*, designed or redesigned, and *intended for use in assembling* or fabricating a firearm silencer...." 26 U.S.C. § 5845(a)(7); 18 U.S.C. § 921(a)(24) (emphasis added). We do not believe Congress intended courts to supply by interpretation in section 5845(c) what it provided by express language in section 5845(a)(7), (b), and (f).

## B. Legislative History

Only very clear evidence of contrary legislative intent can displace the plain mean-

ing of a statute. *Aaron v. SEC*, 446 U.S. 680, 697, 100 S.Ct. 1945, 1956, 64 L.Ed.2d 611 (1980); *Johns–Manville Corp. v. United States*, 855 F.2d 1556, 1559 (Fed.Cir. 1988). Nothing in the history of the National Firearms Act contravenes our reading.

As originally enacted in 1934, the National Firearms Act did not define "rifle". Act of June 26, 1934, 48 Stat. 1236. Though Congress subsequently amended relevant portions of the Act five times and added a definition of "rifle" which it twice specifically altered, it never added language purporting to reach unassembled short-barreled rifle parts. That it did add "combination of parts" language in the case of machineguns, destructive devices, and silencers strongly suggests that it does not intend the Act to cover unassembled pistol conversion kits of the type at issue here.

Congress added definitions of "rifle", "shotgun", and "any other weapon" to the Act in 1954. Internal Revenue Code of 1954, Pub.L. No. 83–591, 68A Stat. 3 (codified at 26 U.S.C. § 5848 (1954)). The original definition of "rifle" read:

> The term "rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and <u>designed and made</u> to use the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

26 U.S.C. § 5848(3) (emphasis added). The accompanying House report explained that the definitions of "rifle", "shotgun", and "any other weapon" were added to *exclude* firearms like blunderbusses, muzzle-loading shotguns, and other ancient or antique guns from the Act's reach, "in pursuance of the clearly indicated congressional intent to cover under the National Firearms Act only such modern and lethal weapons ... as could be readily and efficiently used by criminals and gangsters." H.R.Rep. No. 1337, 83d Cong., 2d Sess. 524, *reprinted in* 1954 U.S.Code Cong. & Admin.News 4019, 4542.

Congress amended the definition of "rifle" four years later by inserting the phrase "designed or redesigned and made or remade" in lieu of the underscored language. Excise Tax Technical Changes Act of 1958, Pub.L. No. 85–859, § 203(f), 72 Stat. 1275, 1427 (1958). The change was intended "to clarify the intent of this section and is in accordance with the administrative construction of existing law." S.Rep. No. 2090, 85th Cong., 2d Sess. 9, *reprinted in* 1958 U.S.Code Cong. & Admin.News 4395, 4603. Part of that administrative construction is a 1954 revenue ruling, later revoked, *see* Rev.Rul. 72–178, 1972–1 C.B. 423–24, that stated "the possession or control of sufficient parts to assemble an operative firearm constitutes the possession of a firearm, and the transfer of sufficient parts to assemble an operative firearm constitutes the transfer of a firearm...." · Rev.Rul. 54–606, 1954–2 C.B. 33. The government relies on the single sentence quoted above from the legislative history of the 1958 amendment and a similar statement in the legislative history of the 1968 amendments to the "rifle" definition, *see* S.Rep. No. 1501, 90th Cong., 2d Sess. 46 (1968), to establish that Congress intended to "adopt" the construction in Revenue Ruling 54–606.

The argument is untenable. Revenue Ruling 54–606 is a substantial and, in our view, unwarranted extension of the statute's plain meaning; we do not think Congress would adopt so sweeping an administrative "amendment" without explicitly mentioning it. *See* *Drasen*, 845 F.2d at 738–39· (Manion, J., dissenting); *United States v. Lauchli*, 371 F.2d 303, 312 (7th Cir.1966) ("we need not go as far as the Internal Revenue Ruling [54–606]"). This is especially so when the manner in which Congress *did* amend the statute—replacing "designed and made" with "designed or redesigned and made or remade"—does not even vaguely reflect, let alone clearly implement, the administrative construction assertedly adopted.

Congress again failed to adopt that construction in 1968 when, in title II of the Gun Control Act of 1968, it generally re-

vised the entire National Firearms Act.[3] Title II modified the definitions of "firearm", "machinegun", "rifle", "shotgun", and "any other weapon" and added definitions of "destructive device" and "make". Gun Control Act of 1968, Pub.L. No. 90–618, title II, 82 Stat. 1213, 1227 (1968). The definition of "firearm" was expanded to include both a weapon made from a rifle that has a barrel less than 16 inches in length (regardless of the weapon's overall length) and a "destructive device". *See* 26 U.S.C. § 5845(a)(4), (8) (1982); S.Rep. 1501, 90th Cong., 2d Sess. 45 (1968) [hereinafter S.Rep. No. 1501]. The "rifle" definition was modified by deleting the limitation that cartridges fired be "metallic" and, more importantly, by adding the phrase "and shall include any such weapon which may be *readily restored* to fire a fixed cartridge." 26 U.S.C. § 5845(c) (1982). The Senate report explains: "the definition has been clarified to specifically include any such weapon which may be readily restored to fire a fixed cartridge. The ... change is consistent with the administrative construction of existing law." S.Rep. No. 1501 at 46.

Congress simultaneously added "readily restored" language to the definitions of "machinegun", "shotgun", and "any other weapon", explaining in the context of "shotgun" that

The clarification is consistent with the administrative construction of existing law. However, a district court held that a shotgun with a missing firing pin was not a firearm as defined in the National Firearms Act. This change is intended to make it completely clear that that court decision [*United States v. Thompson*, 202 F.Supp. 503 (N.D.Cal.1962)] is not consistent with the intended coverage of this subsection.

S.Rep. No. 1501 at 46. Therefore, it appears that by adding the "readily restored" language to the definitions of "machinegun", "rifle", "shotgun", and "any other weapon", Congress intended to preempt judicial decisions exempting weapons from the coverage of the Act solely because they lacked firing pins.[1] Rather than repeat this explanation for each of the sections affected, it summarily said the change was "consistent with" an unspecified administrative construction of existing law. Contrary to the government's argument, Congress did not say, and there is no evidence to suggest, that it intended to "adopt" any specific construction, in particular that given the statute in Revenue Ruling 54–606.

Indeed, the 1968 amendments to the "machinegun" definition and the addition of a "destructive device" definition both illustrate that, "where Congress intended to regulate combinations of parts, it did so precisely and explicitly." *Drasen*, 845 F.2d

---

**3.** Congress also amended the Act in 1960, but it did not change the "rifle" definition. Instead, it altered the definition of "firearm" to include "a rifle having a barrel or barrels of less than 16 inches in length, or any weapon made from a rifle or shotgun (whether by alteration, modification, or otherwise) if such weapon as modified has an overall length of less than 26 inches...." Pub.L. No. 86–478, § 3, 74 Stat. 149 (1960). The purpose of the amendment was two-fold: to exclude from the definition of "firearm" a number of popular sporting rifles having a barrel length slightly under 18 inches (considered firearms under previous law), and to ease administration of the Act. S.Rep. No. 1303, 86th Cong., 2d Sess. 3, *reprinted in* 1960 U.S.Code Cong. & Admin.News 2111, 2113. The amendment is relevant as an example of Congress once again turning its attention to the type of rifles it wanted to regulate under the NFA and, once again, declining to cover combinations of rifle parts.

**4.** The government cites *United States v. Woods*, 560 F.2d 660 (5th Cir.1977), for the proposition that the "readily restored" language of section 5845(d) encompasses an unassembled sawed-off shotgun. *Woods* addresses whether probable cause existed to believe that what looked like a sawed-off shotgun barrel was contraband, thus justifying the subsequent search for the gun's stock and the seizure of both barrel and stock. Therefore, the court's discussion of whether the two unassembled pieces in fact comprised a firearm within the meaning of section 5845(d) is dictum. Moreover, we could agree with the *Woods* dictum but still hold for Thompson. Though the shotgun was in two pieces when found, the court apparently assumed the gun previously had been assembled. *See* 560 F.2d at 664. Finally, in contrast to the Contender pistol and carbine conversion kit, the two pieces could *only* be assembled as a short-barreled shotgun regulated by the Act. *Id.*

at 738 (Manion, J., dissenting). The amended definition of "machinegun"

> provides three new categories as included within the term "machinegun": (1) the frame or receiver of a machinegun, (2) *any combination of parts* designed and intended for use in converting a weapon other than a machinegun into a machinegun; *for example, so-called conversion kits,* and (3) *any combination of parts* from which a machinegun can be assembled if such parts are in the possession of a person.

S.Rep. No. 1501 at 45–46 (emphasis added). It is not by accident or oversight that Congress amended the definition of "machinegun" but not "rifle" to include unassembled parts, particularly conversion kits.[5] Though it is unclear whether competitors of Thompson manufactured conversion kits for the Contender pistol prior to 1968—according to the uncontroverted affidavit of Thompson's president Robert L. Gustafson, the Contender pistol has been manufactured continuously since 1967 and conversion kits have been marketed since the late 1960s—thousands of the kits existed when, in 1986, Congress again amended the Act and again declined to add combination of parts language to the definition of "rifle". *See* Firearms Owners' Protection Act, Pub.L. No. 99–308, § 109, 100 Stat. 449, 460 (1986).

Finally, what is true of the amended definition of "machinegun" is true of the added definition of "destructive device". The term includes *"any combination of parts* either designed or intended for use in converting any device into a destructive device ... and from which a destructive device may be readily assembled." 26 U.S.C. § 5845(f) (1982). That Congress deliberately included "combination of parts" language in the definition of "destructive device" strongly suggests that it did not inadvertently omit similar language in the definition of "rifle".

As mentioned above, Congress last amended the National Firearms Act in 1986. Again the amendments demonstrate that when Congress intends to regulate unassembled parts, it does so explicitly. Section 109 of the Firearms Owners' Protection Act amended the definition of "firearm" in section 5845(a) to include "(7) any silencer (as defined in section 921 of title 18, United States Code)." 100 Stat. at 460. Section 101 of the same act adds to section 921 of title 18 the following definition:

> (24) The terms "firearm silencer" and "firearm muffler" mean any device for silencing, muffling, or diminishing the report of a portable firearm, *including any combination of parts,* designed or redesigned and intended for use in assembling or fabricating a firearm silencer or firearm muffler, *and any part intended only for use in such assembly or fabrication.*

100 Stat. at 451; *see* 18 U.S.C. § 921(a)(24).[6] Congress reiterated in the preamble to the act what it had first stated in section 101 of the Gun Control Act of 1968: "it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, posses-

---

**5.** *United States v. Kokin,* 365 F.2d 595 (3d Cir. 1966), and *United States v. Lauchli,* 371 F.2d 303 (7th Cir.1966), decided prior to the 1968 amendments, do not establish the proposition for which the government cites them—"that the transfer of parts from which operative machine guns could be assembled constituted the transfer of machine guns under the Act"—and do not otherwise support its argument. In both cases, the defendant actually assembled some of the parts as complete machine guns, and the parts could *only* be assembled as firearms within the meaning of the Act. *See* 371 F.2d at 313. Moreover, in *Lauchli* at least, the transferees demanded complete and operable machineguns and the defendant gave them a booklet explaining how to so assemble them. *Id.* at 312.

**6.** A companion law to the Firearms Owners' Protection Act amended the definition of "ammunition" in § 921(a)(17) of the Gun Control Act by adding a new subsection defining "armor piercing ammunition". *See* Pub.L. No. 99–408, § 1, 100 Stat. 920 (1986). Section 10 of that law provides, "For purposes of section 921(a)(17)(B) of title 18 ... 'handgun' means any firearm including a pistol or revolver designed to be fired by the use of a single hand. The term also includes *any combination of parts* from which a handgun can be assembled." 100 Stat. at 922; *see* 18 U.S.C. § 921 note.

sion, or use of firearms appropriate to the purpose of hunting ... target shooting ... or any other lawful activity...." 100 Stat. at 449. This admonition, were it even necessary, requires us to decline the government's invitation to expand the definition of "rifle" to encompass the Contender pistol and carbine conversion kit. The government admits that both pistol and carbine are intended and primarily used for the legitimate purposes of hunting and target shooting. Thus, even if we adopted the policy-driven mode of analysis used in *United States v. Endicott*, 803 F.2d 506 (9th Cir.1986), and *United States v. Luce*, 726 F.2d 47 (1st Cir.1984), cases holding that the pre–1986 version of section 5845(a)(7) included component parts of a silencer, we would reach the same conclusion. Unlike a silencer, the Contender pistol and carbine are admittedly not " 'gangster-type' devices". *Luce*, 726 F.2d at 49.

### C. Cases Construing "Rifle"

With one exception, other cases construing the word "rifle" are consistent with our interpretation. For example, *United States v. Combs*, 762 F.2d 1343 (9th Cir. 1985), affirmed Combs's conviction for possessing an unregistered firearm in violation of sections 5841 and 5861(d) of the Act. In response to Combs's argument that he did not "make" a firearm which section 5841 would require him to register, the court observed,

> [t]he government offered expert testimony that when Combs replaced the Uzi's 16–inch barrel with a 9¼–inch barrel he altered the Uzi from a legal rifle to an illegal concealable pistol.... The evidence at trial indicated that the barrel originally attached to the rifle was detached and the shortened barrel installed in its place. Combs was found in possession of the Uzi with the shortened barrel, and the barrel of legal length with which the Uzi is sold in the United States was found in the back of his truck along with the case for the Uzi. From the evidence

presented at trial, there was sufficient evidence for the jury to conclude that Combs bought the shorter barrel and installed it. *Thus the Uzi was altered by Combs and therefore was "made" within the terms of the statute.*

762 F.2d at 1347. Like the Contender pistol and carbine conversion kit, the Uzi submachinegun and separate 9¼–inch barrel can be assembled as either a legal carbine or a proscribed short-barreled rifle. Moreover, like the Contender, the Uzi is sold with an imprinted warning (also appearing in the instruction manual) that replacing the 16–inch barrel with a shorter barrel creates an illegal weapon. *Id.* We think *Combs* correctly held that a short-barreled rifle is "made", i.e., that a firearm within the meaning of section 5845(a)(3) or (4) exists, when its component parts are actually assembled as such. *See also United States v. Rose*, 695 F.2d 1356 (10th Cir. 1982) (Uzi submachine guns with barrels sawed off to a length less than 16 inches are rifles as defined in the National Firearms Act; sawing off the barrels constitutes "making" an illegal firearm).

Only *United States v. Drasen*, 845 F.2d 731 (7th Cir.1988), is arguably inconsistent. That case held that complete but unassembled short-barrel rifle parts kits were "rifles" within the meaning of section 5845(c). Like the other cases on which the government relies—*Woods, Lauchli, Kokin, Endicott*, and *Luce*—*Drasen* involved unassembled parts that could *only* be assembled as illegal firearms. This distinction, if not dispositive, is important. *Drasen* is also inconsistent with an earlier Seventh Circuit case, *United States v. Zeidman*, 444 F.2d 1051 (1971), in which the court upheld Zeidman's conviction for possessing an illegal short-barreled rifle which, though in two pieces when seized, previously had been assembled in the presence of Zeidman by an undercover government investigator. The court observed *"Once the two parts are attached in rifle form,* it becomes

clear that the single unit fits the definition of a short barreled rifle." *Id.* at 1053 (emphasis added). To the extent, if any, that *Drasen* is inconsistent with our decision here, we decline to follow it.

*Conclusion*

Accordingly, the judgment of the Claims Court is reversed.

REVERSED.