# UNITED STATES *v.* THOMPSON/CENTER ARMS CO.

No. 91–164.   Argued January 13, 1992—Decided June 8, 1992

SOUTER, J., announced the judgment of the Court and delivered an opinion, in which REHNQUIST, C. J., and O'CONNOR, J., joined. SCALIA, J., filed an opinion concurring in the judgment, in which THOMAS, J., joined, *post*, p. 519. WHITE, J., filed a dissenting opinion, in which BLACKMUN, STEVENS, and KENNEDY, JJ., joined, *post*, p. 523. STEVENS, J., filed a dissenting opinion, *post*, p. 525.

*James A. Feldman* argued the cause for the United States. On the briefs were *Solicitor General Starr, Assistant Attorney General Peterson, Deputy Solicitor General Wallace, Kent L. Jones, Gilbert S. Rothenberg,* and *Steven W. Parks.*

*Stephen P. Halbrook* argued the cause and filed a brief for respondent.*

JUSTICE SOUTER announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE and JUSTICE O'CONNOR join.

Section 5821 of the National Firearms Act (NFA or Act), see 26 U. S. C. § 5849, levies a tax of $200 per unit upon any-

---

*Richard E. Gardiner* filed a brief for Senator Larry E. Craig et al. as *amici curiae* urging affirmance.

one "making" a "firearm" as that term is defined in the Act. Neither pistols nor rifles with barrels 16 inches long or longer are firearms within the NFA definition, but rifles with barrels less than 16 inches long, known as short-barreled rifles, are. § 5845(a)(3). This case presents the question whether a gun manufacturer "makes" a short-barreled rifle when it packages as a unit a pistol together with a kit containing a shoulder stock and a 21-inch barrel, permitting the pistol's conversion into an unregulated long-barreled rifle,[1] or, if the pistol's barrel is left on the gun, a short-barreled rifle that is regulated. We hold that the statutory language may not be construed to require payment of the tax under these facts.

## I

The word "firearm" is used as a term of art in the NFA. It means, among other things, "a rifle having a barrel or barrels of less than 16 inches in length . . . ." § 5845(a)(3). "The term 'rifle' means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge." § 5845(c).

The consequence of being the maker of a firearm are serious. Section 5821(a) imposes a tax of $200 "for each firearm made," which "shall be paid by the person making the firearm," § 5821(b). Before one may make a firearm, one must obtain the approval of the Secretary of the Treasury, § 5822, and § 5841 requires that the "manufacturer, importer, and maker . . . register each firearm he manufactures, imports, or makes" in a central registry maintained by the Secretary of the Treasury. A maker who fails to comply with the NFA's provisions is subject to criminal penalties of up to 10

---

[1] Unregulated, that is, under the NFA.

years' imprisonment and a fine of up to $10,000, or both, which may be imposed without proof of willfulness or knowledge. § 5871.

Respondent Thompson/Center Arms Company manufactures a single-shot pistol called the "Contender," designed so that its handle and barrel can be removed from its "receiver," the metal frame housing the trigger, hammer, and firing mechanism. See 27 CFR § 179.11 (1991) (definition of frame or receiver). For a short time in 1985, Thompson/Center also manufactured a carbine-conversion kit consisting of a 21-inch barrel, a rifle stock, and a wooden fore-end. If one joins the receiver with the conversion kit's rifle stock, the 21-inch barrel, and the rifle fore-end, the product is a carbine rifle with a 21-inch barrel. If, however, the shorter, pistol-length barrel is not removed from the receiver when the rifle stock is added, one is left with a 10-inch or "short-barreled" carbine rifle. The entire conversion, from pistol to long-barreled rifle takes only a few minutes; conversion to a short-barreled rifle takes even less time.

In 1985, the Bureau of Alcohol, Tobacco and Firearms advised Thompson/Center that when its conversion kit was possessed or distributed together with the Contender pistol, the unit constituted a firearm subject to the NFA. Thompson/Center responded by paying the $200 tax for a single such firearm, and submitting an application for permission under 26 U. S. C. § 5822 "to make, use, and segregate as a single unit" a package consisting of a serially numbered pistol, together with an attachable shoulder stock and a 21-inch barrel. Thompson/Center then filed a refund claim. After more than six months had elapsed without action on it, the company brought this suit in the United States Claims Court under the Tucker Act, 28 U. S. C. § 1491, arguing that the unit registered was not a firearm within the meaning of the NFA because Thompson/Center had not assembled a short-barreled rifle from its components. The Claims Court

entered summary judgment for the Government, concluding that the Contender pistol together with its conversion kit is a firearm within the meaning of the NFA. 19 Cl. Ct. 725 (1990).

The Court of Appeals for the Federal Circuit reversed, holding that a short-barreled rifle "actually must be assembled" in order to be "made" within the meaning of the NFA. 924 F. 2d 1041, 1043 (1991). The Court of Appeals expressly declined to follow the decision of the Court of Appeals for the Seventh Circuit in *United States* v. *Drasen*, 845 F. 2d 731, cert. denied, 488 U. S. 909 (1988), which had held that an unassembled "complete parts kit" for a short-barreled rifle was in fact a short-barreled rifle for purposes of the NFA. We granted certiorari to resolve this conflict. 502 U. S. 807 (1991).

## II

The NFA provides that "[t]he term 'make', and the various derivatives of such word, shall include manufacturing (other than by one qualified to engage in such business under this chapter), putting together, altering, any combination of these, or otherwise producing a firearm." 26 U. S. C. § 5845(i).[2] But the provision does not expressly address the question whether a short-barreled rifle can be "made" by the aggregation of finished parts that can readily be assembled into one. The Government contends that assembly is not necessary; Thompson/Center argues that it is.

## A

The Government urges us to view the shipment of the pistol with the kit just as we would the shipment of a bicycle

---

[2] The phrase "other than by one qualified to engage in such business under this chapter" apparently refers to those manufacturers who have sought and obtained qualification as a firearms manufacturer under 26 U. S. C. § 5801(a)(1), which requires payment of a $1,000 occupational tax. Rather than seek such qualification, Thompson/Center applied for permission to make a firearm as a nonqualified manufacturer under § 5822, which requires payment of the $200 per firearm "making tax" under § 5821(a).

that requires some home assembly. "The fact that a short-barrel rifle, or any other 'firearm,' is possessed or sold in a partially unassembled state does not remove it from regulation under the Act." . Brief for United States 6.

The Government's analogy of the partially assembled bicycle to the packaged pistol and conversion kit is not, of course, exact. While each example includes some unassembled parts, the crated bicycle parts can be assembled into nothing but a bicycle, whereas the contents of Thompson/Center's package can constitute a pistol, a long-barreled rifle, or a short-barreled version. These distinctions, however, do define the issues raised by the Government's argument, the first of which is whether the aggregation and segregation of separate parts that can be assembled only into a short-barreled rifle and are sufficient for that purpose amount to "making" that firearm, or whether the firearm is not "made" until the moment of final assembly. This is the issue on which the Federal and Seventh Circuits are divided.

We think the language of the statute provides a clear answer on this point. The definition of "make" includes not only "putting together," but also "manufacturing . . . or otherwise producing a firearm." If as Thompson/Center submits, a firearm were only made at the time of final assembly (the moment the firearm was "put together"), the additional language would be redundant. Congress must, then, have understood "making" to cover more than final assembly, and some disassembled aggregation of parts must be included. Since the narrowest example of a combination of parts that might be included is a set of parts that could be used to make nothing but a short-barreled rifle, the aggregation of such a set of parts, at the very least, must fall within the definition of "making" such a rifle.

This is consistent with the holdings of every Court of Appeals, except the court below, to consider a combination of parts that could only be assembled into an NFA-regulated

firearm, either under the definition of rifle at issue here or under similar statutory language. See *United States* v. *Drasen, supra; United States* v. *Endicott*, 803 F. 2d 506, 508–509 (CA9 1986) (unassembled silencer is a silencer); *United States* v. *Luce*, 726 F. 2d 47, 48–49 (CA1 1984) (same); *United States* v. *Lauchli*, 371 F. 2d 303, 311–313 (CA7 1966) (unassembled machineguns are machineguns).[3] We thus reject the broad language of the Court of Appeals for the Federal Circuit to the extent that it would mean that a disassembled complete short-barreled rifle kit must be assembled before it has been "made" into a short-barreled rifle. The fact that the statute would serve almost no purpose if this were the rule only confirms the reading we have given it.[4]

We also think that a firearm is "made" on facts one step removed from the paradigm of the aggregated parts that can be used for nothing except assembling a firearm. Two courts to our knowledge have dealt in some way with claims that when a gun other than a firearm was placed together

---

[3] In *Drasen*, a complete-parts kit was sold with a flash suppressor, which, if affixed to the rifle barrel, would have extended it beyond the regulated length. See *Drasen*, 845 F. 2d, at 737. Because the *Drasen* court concluded that such a flash suppressor was not a part of the rifle's barrel, see *ibid.*, its holding is consistent with ours.

[4] We do not accept the Government's suggestion, however, that complete-parts kits must be taxable because otherwise manufacturers will be able to "avoid the tax." Brief for United States 11. Rather, we conclude that such kits are within the definition of the taxable item. Failure to pay the tax on such a kit thus would amount to evasion, not avoidance. In our system, avoidance of a tax by remaining outside the ambit of the law that imposes it is every person's right. "Over and over again courts have said that there is nothing sinister in so arranging one's affairs as to keep taxes as low as possible. Everybody does so, rich or poor; and all do right, for nobody owes any public duty to pay more than the law demands: taxes are enforced exactions, not voluntary contributions. To demand more in the name of morals is mere cant." *Commissioner* v. *Newman*, 159 F. 2d 848, 850–851 (CA2) (L. Hand, J., dissenting), cert. denied, 331 U. S. 859 (1947).

with a further part or parts that would have had no use in association with the gun except to convert it into a firearm, a firearm was produced. See *United States* v. *Kokin*, 365 F. 2d 595, 596 (CA3) (carbine together with all parts necessary to convert it into a machinegun is a machinegun), cert. denied, 385 U. S. 987 (1966); see also *United States* v. *Zeidman*, 444 F. 2d 1051, 1053 (CA7 1971) (pistol and attachable shoulder stock found "in different drawers of the same dresser" constitute a short-barreled rifle). Here it is true, of course, that some of the parts could be used without ever assembling a firearm, but the likelihood of that is belied by the utter uselessness of placing the converting parts with the others except for just such a conversion. Where the evidence in a given case supports a finding of such uselessness, the case falls within the fair intendment of "otherwise producing a firearm." See 26 U. S. C. § 5845(i).[5]

## B

Here, however, we are not dealing with an aggregation of parts that can serve no useful purpose except the assembly

---

[5] Contrary to JUSTICE SCALIA's suggestion, see *post*, at 522, our understanding of these aggregations of parts, shared by a majority of the Court (those who join this opinion and the four Members of the Court in dissent, see *post*, p. 523 (WHITE, J., joined by BLACKMUN, STEVENS, and KENNEDY, JJ., dissenting) (*any* aggregation of parts necessary to assemble a firearm is a firearm)), applies to all the provisions of the Act, whether they regulate the "making" of a firearm, *e. g.*, 26 U. S. C. § 5821(a), or not, see, *e. g.*, § 5842(b) (possession of a firearm that has no serial number); § 5844 (importation of a firearm); § 5811 (transfer of a firearm). Since, as we conclude, such a combination of parts, or of a complete gun and an additional part or parts, is "made" into a firearm, it follows, in the absence of some reason to the contrary, that all portions of the Act that apply to "firearms" apply to such a combination. JUSTICE SCALIA does not explain how we would be free to construe "firearm" in a different way for purposes of those provisions that do not contain the verb "to make." Our normal canons of construction caution us to read the statute as a whole, and, unless there is a good reason, to adopt a consistent interpretation of a term used in more than one place within a statute.

of a firearm, or with an aggregation having no ostensible utility except to convert a gun into such a weapon. There is, to be sure, one resemblance to the latter example in the sale of the Contender with the converter kit, for packaging the two has no apparent object except to convert the pistol into something else at some point. But the resemblance ends with the fact that the unregulated Contender pistol can be converted not only into a short-barreled rifle, which is a regulated firearm, but also into a long-barreled rifle, which is not. The packaging of pistol and kit has an obvious utility for those who want both a pistol and a regular rifle, and the question is whether the mere possibility of their use to assemble a regulated firearm is enough to place their combined packaging within the scope of "making" one.[6]

### 1

Neither the statute's language nor its structure provides any definitive guidance. Thompson/Center suggests guidance may be found in some subsections of the statute governing other types of weapons by language that expressly covers combinations of parts. The definition of "machine-gun," for example, was amended by the Gun Control Act of

---

[6] Thompson/Center suggests that further enquiry could be avoided when it contends that the Contender and carbine kit do not amount to a "rifle" of any kind because, until assembled into a rifle, they are not "'made' and 'intended to be fired from the shoulder.'" Brief for Respondent 8. From what we have said thus far, however, it is apparent that, though disassembled, the parts included when the Contender and its carbine kit are packaged together have been "made" into a rifle. The inclusion of the rifle stock in the package brings the Contender and carbine kit within the "intended to be fired from the shoulder" language contained in the definition of rifle in the statute. See 26 U. S. C. § 5845(c). The only question is whether this combination of parts constitutes a short-barreled rifle. Surely JUSTICE SCALIA's argument would take us over the line between lenity and credulity when he suggests that one who makes what would otherwise be a short-barreled rifle could escape liability by carving a warning into the shoulder stock. See *post*, at 523 (SCALIA, J., concurring in judgment).

1968 to read that "[t]he term shall also include . . . any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." 26 U. S. C. § 5845(b).[7]  In 1986, the definition of "silencer" was amended by the Firearms Owners' Protection Act to "includ[e] any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer . . . ."  See 26 U. S. C. § 5845(a)(7); 18 U. S. C. § 921(a)(24).

Thompson/Center stresses the contrast between these references to "any combination of parts" and the silence about parts in the definition of rifle in arguing that no aggregation of parts can suffice to make the regulated rifle.  This argument is subject to a number of answers, however.  First, it sweeps so broadly as to conflict with the statutory definition of "make," applicable to all firearms, which implies that a firearm may be "made" even where not fully "put together."  If this were all, of course, the conflict might well be resolved in Thompson/Center's favor.  We do not, however, read the machinegun and silencer definitions as contrasting with the definition of rifle in such a way as to raise a conflict with the broad concept of "making."

The definition of "silencer" is now included in the NFA only by reference, see 26 U. S. C. § 5845(a)(7), whereas its text appears only at 18 U. S. C. § 921(a)(24), in a statute that itself contains no definition of "make."  Prior to 1986 the definition of "firearm" in the NFA included "a muffler or a silencer for any firearm whether or not such firearm is included within this definition."  26 U. S. C. § 5845(a)(7) (1982 ed.).  Two Courts of Appeals held this language to include

---

[7] At the same time, the definition of "destructive device" was amended to include "any combination of parts either designed or intended for use in converting any device into a destructive device . . . and from which a destructive device may readily be assembled." 26 U. S. C. § 5845(f). This appears to envision by its terms only combinations of parts for converting something into a destructive device.

unassembled silencers that could be readily and easily assembled. See *United States* v. *Endicott,* 803 F. 2d, at 508–509; *United States* v. *Luce,* 726 F. 2d, at 48–49.

In 1986, Congress replaced that language with "any silencer (as defined in section 921 of title 18, United States Code)." Pub. L. 99–308, § 109(b), 100 Stat. 460. The language defining silencer that was added to 18 U. S. C. § 921 at that same time reads: "The terms 'firearm silencer' and 'firearm muffler' mean any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." Pub. L. 99–308, § 101, 100 Stat. 451.

Thompson/Center argues that if, even before the amendment, a combination of parts was already "made" into a firearm, the "any combination of parts" language would be redundant. While such a conclusion of redundancy could suggest that Congress assumed that "make" in the NFA did not cover unassembled parts, the suggestion (and the implied conflict with our reading of "make") is proven false by evidence that Congress actually understood redundancy to result from its new silencer definition. Congress apparently assumed that the statute reached complete-parts kits even without the "combination" language and understood the net effect of the new definition as expanding the coverage of the Act beyond complete-parts kits. "The definition of silencer is amended to include any part designed or redesigned and intended to be used as a silencer for a firearm. This will help to control the sale of incomplete silencer kits that now circumvent the prohibition on selling complete kits." H. R. Rep. No. 99–495, p. 21 (1986). Because the addition of the "combination of parts" language to the definition of silencer does not, therefore, bear the implication Thompson/Center

would put on it, that definition cannot give us much guidance in answering the question before us.[8]

We get no more help from analyzing the machinegun definition's reference to parts. It speaks of "any combination" of them in the possession or control of any one person. Here the definition sweeps broader than the aggregation of parts clearly covered by "making" a rifle. The machinegun parts need not even be in any particular proximity to each other. There is thus no conflict between definitions, but neither is much light shed on the limits of "making" a short-barreled rifle. We can only say that the notion of an unassembled machinegun is probably broader than that of an unassembled rifle. But just where the line is to be drawn on short-barreled rifles is not demonstrated by textual considerations.

2

Thompson/Center also looks for the answer in the purpose and history of the NFA, arguing that the congressional purpose behind the NFA, of regulating weapons useful for criminal purposes, should caution against drawing the line in such a way as to apply the Act to the Contender pistol and carbine kit. See H. R. Rep. No. 1337, 83d Cong., 2d Sess., A395 (1954) (the adoption of the original definition of rifle was intended to preclude coverage of antique guns held by collec-

---

[8] JUSTICE SCALIA upbraids us for reliance on legislative history, his "St. Jude of the hagiology of statutory construction." *Post*, at 521. The shrine, however, is well peopled (though it has room for one more) and its congregation has included such noted elders as Justice Frankfurter: "A statute, like other living organisms, derives significance and sustenance from its environment, from which it cannot be severed without being mutilated. Especially is this true where the statute, like the one before us, is part of a legislative process having a history and a purpose. The meaning of such a statute cannot be gained by confining inquiry within its four corners. Only the historic process of which such legislation is an incomplete fragment—that to which it gave rise as well as that which gave rise to it—can yield its true meaning." *United States* v. *Monia*, 317 U. S. 424, 432 (1943) (dissenting opinion).

tors, "in pursuance of the clearly indicated congressional intent to cover under the National Firearms Act only such modern and lethal weapons, except pistols and revolvers, as could be used readily and efficiently by criminals or gangsters").

It is of course clear from the face of the Act that the NFA's object was to regulate certain weapons likely to be used for criminal purposes, just as the regulation of short-barreled rifles, for example, addresses a concealable weapon likely to be so used. But when Thompson/Center urges us to recognize that "the Contender pistol and carbine kit is not a criminal-type weapon," Brief for Respondent 20, it does not really address the issue of where the line should be drawn in deciding what combinations of parts are "made" into short-barreled rifles. Its argument goes to the quite different issue whether the single-shot Contender should be treated as a firearm within the meaning of the Act even when assembled with a rifle stock.

Since Thompson/Center's observations on this extraneous issue shed no light on the limits of unassembled "making" under the Act, we will say no more about congressional purpose. Nor are we helped by the NFA's legislative history, in which we find nothing to support a conclusion one way or the other about the narrow issue presented here.

## III

After applying the ordinary rules of statutory construction, then, we are left with an ambiguous statute. The key to resolving the ambiguity lies in recognizing that although it is a tax statute that we construe now in a civil setting, the NFA has criminal applications that carry no additional requirement of willfulness. Cf. *Cheek* v. *United States,* 498 U. S. 192, 200 (1991) ("Congress has . . . softened the impact of the common-law presumption [that ignorance of the law is no defense to criminal prosecution] by making specific intent to violate the law an element of certain federal criminal

tax offenses"); 26 U. S. C. §§ 7201, 7203 (criminalizing willful evasion of taxes and willful failure to file a return). Making a firearm without approval may be subject to criminal sanction, as is possession of an unregistered firearm and failure to pay the tax on one, 26 U. S. C. §§ 5861, 5871. It is proper, therefore, to apply the rule of lenity and resolve the ambiguity in Thompson/Center's favor. See *Crandon* v. *United States*, 494 U. S. 152, 168 (1990) (applying lenity in interpreting a criminal statute invoked in a civil action); *Commissioner* v. *Acker*, 361 U. S. 87, 91 (1959).[9] Accordingly, we conclude that the Contender pistol and carbine kit when packaged together by Thompson/Center have not been "made" into a short-barreled rifle for purposes of the NFA.[10] The judgment of the Court of Appeals is therefore

*Affirmed.*

---

[9] The Government has urged us to defer to an agency interpretation contained in two longstanding Revenue Rulings. Even if they were entitled to deference, neither of the rulings, Rev. Rul. 61–45, 1961–1 Cum. Bull. 663, and Rev. Rul. 61–203, 1961–2 Cum. Bull. 224 (same), goes to the narrow question presented here, addressing rather the question whether pistols with short barrels and attachable shoulder stocks are short-barreled rifles. We do not read the Government to be relying upon Rev. Rul. 54–606, 1954–2 Cum. Bull. 33, which was repealed as obsolete in 1972, Rev. Rul. 72–178, 1972–1 Cum. Bull. 423, and which contained broader language that "possession or control of sufficient parts to assemble an operative firearm . . . constitutes the possession of a firearm." Reply Brief for United States 10.

[10] JUSTICE STEVENS contends that lenity should not be applied because this is a "'tax statute,'" *post*, at 526, rather than a "criminal statute," see *post*, at 525, n. 1, quoting *Crandon* v. *United States*, 494 U. S. 152, 168 (1990). But this tax statute has criminal applications, and we know of no other basis for determining when the essential nature of a statute is "criminal." Surely, JUSTICE STEVENS cannot mean to suggest that in order for the rule of lenity to apply, the statute must be contained in the Criminal Code. See, *e. g., United States* v. *Universal C. I. T. Credit Corp.*, 344 U. S. 218, 221–222 (1952) (construing the criminal provisions of the Fair Labor Standards Act, 29 U. S. C. §§ 215, 216(a)). JUSTICE STEVENS further suggests that lenity is inappropriate because we construe the statute today

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring in the judgment.

I agree with the plurality that the application of the National Firearms Act (NFA) to Thompson/Center's pistol and conversion kit is sufficiently ambiguous to trigger the rule of lenity, leading to the conclusion that the kit is not covered. I disagree with the plurality, however, over where the ambiguity lies—a point that makes no difference to the outcome here, but will make considerable difference in future cases. The plurality thinks the ambiguity pertains to whether the making of a regulated firearm includes (i) the manufacture of parts kits that can possibly be used to assemble a regulated firearm, or rather includes only (ii) the manufacture of parts kits that serve no useful purpose except assembly of a regulated firearm. *Ante*, at 512–513, 517. I think the ambiguity pertains to the much more fundamental point of whether the making of a regulated firearm includes the manufacture, without assembly, of component parts where the definition of the particular firearm does not so indicate.

As JUSTICE WHITE points out, the choice the plurality worries about is nowhere suggested by the language of the statute: § 5845 simply makes no reference to the "'utility'" of aggregable parts. *Post*, at 524 (dissenting opinion). It *does*, however, conspicuously combine references to "combination of parts" in the definitions of regulated silencers, machineguns, and destructive devices with the absence of any such reference in the definition of regulated rifles. This, rather than the utility or not of a given part in a given parts assemblage, convinces me that the provision does not encom-

---

"'in a civil setting,'" rather than a "criminal prosecution." *Post*, at 526. The rule of lenity, however, is a rule of statutory construction whose purpose is to help give authoritative meaning to statutory language. It is not a rule of administration calling for courts to refrain in criminal cases from applying statutory language that would have been held to apply if challenged in civil litigation.

pass Thompson/Center's pistol and conversion kit, or at least does not do so unambiguously.

The plurality reaches its textually uncharted destination by determining that the statutory definition of "make," the derivative of which appears as an operative word in 26 U. S. C. § 5821 ("There shall be levied, collected, and paid upon the making of a firearm a tax at the rate of $200 for each firearm made"), covers the making of parts that, assembled, are firearms. Noting that the "definition of 'make' includes not only 'putting together,' but also 'manufacturing . . . or otherwise producing a firearm,'" the plurality reasons that if "a firearm were only made at the time of final assembly (the moment the firearm was 'put together'), the additional language would be redundant." *Ante,* at 510.

This reasoning seems to me mistaken. I do not think that if "making" requires "putting together," other language of the definition section ("manufacturing" and "otherwise producing") becomes redundant. "Manufacturing" is qualified by the parenthetical phrase "(other than by one qualified to engage in such business under this chapter)," whereas "putting together" is not. Thus, one who assembles a firearm *and also engages in the prior activity of producing the component parts* can be immunized from being considered to be making firearms by demonstrating the relevant qualification, whereas one who merely assembles parts manufactured by others cannot. Recognition of this distinction is alone enough to explain the separate inclusion of "putting together," even though "manufacturing" itself includes assembly. As for the phrase "otherwise producing," that may well be redundant, but such residual provisions often are. They are often meant for insurance, to cover anything the draftsman might inadvertently have omitted in the antecedent catalog; and if the draftsman is good enough, he will have omitted nothing at all. They are a prime example of provisions in which "iteration is obviously afoot," *Moskal* v. *United States,* 498 U. S. 103, 120 (1990) (SCALIA, J., dissenting), and

for which an inflexible rule of avoiding redundancy will produce disaster. In any event, the plurality's own interpretation (whereby "manufacturing" a firearm does not require assembling it, and "putting together" is an entirely separate category of "making") renders it not a bit easier to conceive of a nonredundant application for "otherwise producing."

The plurality struggles to explain why its interpretation ("making" does not require assembly of component parts) does not *itself* render redundant the "combination of parts" language found elsewhere in 26 U. S. C. §5845, in the definitions of machinegun and destructive device, §§5845(b) and (f), and in the incorporated-by-reference definition of silencer, §5845(a)(7) (referring to 18 U. S. C. §921). See *ante*, at 513–516. I do not find its explanations persuasive, particularly that with respect to silencer, which resorts to that last hope of lost interpretive causes, that St. Jude of the hagiology of statutory construction, legislative history. As I have said before, reliance on that source is particularly inappropriate in determining the meaning of a statute with criminal application. *United States* v. *R. L. C.*, 503 U. S. 291, 307 (1992) (opinion concurring in part and concurring in judgment).

There is another reason why the plurality's interpretation is incorrect: It determines what constitutes a regulated "firearm" via an operative provision of the NFA (here §5821, the *making* tax) rather than by way of §5845, which defines firearms covered by the chapter. With respect to the definitions of machineguns, destructive devices, and silencers, for instance, the reference to "combination of parts" causes parts aggregations to be firearms *whenever* those nouns are used, and not just when they are used in conjunction with the verb "make" and its derivatives. Thus, the restrictions of §5844, which regulate the importation of "firearm[s]" (a term defined to include "machinegun[s]," see §5845(a)(6)), apply to a "combination of parts from which a machinegun can be assembled" (because that is part of the *definition* of

machinegun) *even though* the word "make" and its deriva-
tives do not appear in § 5844. This demonstrates, I say, the
error of the plurality's interpretation, because it makes no
sense to have the firearms regulated by the NFA bear one
identity (which includes *components* of rifles and shotguns)
when they are the object of the verb "make," and a different
identity (excluding such components) when they are not.
Section 5842(a), for example, requires anyone "making" a
firearm to identify it with a serial number that may not be
readily removed; § 5842(b) requires any person who "pos-
sesses" a firearm lacking the requisite serial number to iden-
tify it with one assigned by the Secretary of the Treasury.
Under the plurality's interpretation, all the firearms covered
by (a) are not covered by (b), since a person who "possesses"
the components for a rifle or shotgun does not possess a fire-
arm, even though a person who "makes" the components for
a rifle or shotgun makes a firearm. For similar reasons, the
tax imposed on "the making of a firearm" by § 5821 would
apply to the making of components for rifles and shotguns,
but the tax imposed on "firearms transferred" by § 5811
would not apply to the transfer of such components. This
cannot possibly be right.*

Finally, even if it were the case that unassembled parts
could constitute a rifle, I do not think it was established in

---

*The plurality, as I read its opinion, relies on the derivative of "make"
that appears in § 5821, not that appearing (in a quite different context) in
the definition of "rifle." See 26 U. S. C. § 5845(c) ("The term 'rifle' means
a weapon designed or redesigned, made or remade . . ."). I think it would
not be possible to rely upon the use of "made" in § 5845(c), where the
context is obviously suggestive of assembled rather than unassembled ri-
fles. But even if the plurality means to apply its interpretation of "make"
to § 5845(c), it still does not entirely avoid the problem I have identified.
The definition of "any other weapon," another in § 5845's arsenal of defined
firearms, does not contain relevant uses of the verb "make" or any deriva-
tive thereof. See 26 U. S. C. § 5845(e). It necessarily follows that "any
other weapon" will mean one thing when a making tax is at hand but
something else when a transfer tax is.

this case that respondent manufactured (assembled or not) a rifle "having a barrel or barrels of less than 16 inches in length," which is what the definition of "firearm" requires, § 5845(a)(3). For the definition of "rifle" requires that it be "intended to be fired from the shoulder," § 5845(c), and the only combination of parts so intended, as far as respondent is concerned (and the record contains no indication of anyone else's intent), is the combination that forms a rifle with a 21-inch barrel. The kit's instructions emphasized that legal sanctions attached to the unauthorized making of a short-barreled rifle, and there was even carved into the shoulder stock itself the following: "WARNING. FEDERAL LAW PROHIBITS USE WITH BARREL LESS THAN 16 INCHES."

Since I agree (for a different reason) that the rule of lenity prevents these kits from being considered firearms within the meaning of the NFA, I concur in the judgment of the Court.

JUSTICE WHITE, with whom JUSTICE BLACKMUN, JUSTICE STEVENS, and JUSTICE KENNEDY join, dissenting.

The Court of Appeals for the Federal Circuit concluded that, to meet the definition of "firearm" under the National Firearms Act (NFA), 26 U. S. C. § 5845(a)(3), "a short-barreled rifle actually must be assembled." 924 F. 2d 1041, 1043 (1991) (footnote omitted). I agree with the plurality that this pinched interpretation of the statute would fail to accord the term "make" its full meaning as that term is defined, § 5845(i), and used in the definition of the term "rifle," § 5845(c). Because one "makes" a firearm not only in the actual "putting together" of the parts, but also by "manufacturing . . . or otherwise producing a firearm," Congress clearly intended that the "making" include a "disassembled aggregation of parts," *ante*, at 510, where the assemblage of such parts results in a firearm. In short, when the components necessary to assemble a rifle are produced and held in

conjunction with one another, a "rifle" is, not surprisingly, the result.

This was the difficult issue presented by this case, and its resolution, for me, is dispositive, as respondent Thompson/Center concedes that it manufactures and distributes together a collection of parts that may be readily assembled into a short-barreled rifle. Indeed, Thompson/Center's argument concerning statutory construction, as well as its appeal to the rule of lenity, does not suggest, nor does any case brought to our attention, that one may escape the tax and registration requirements the NFA imposes on those who "make" regulated rifles simply by distributing as part of the package other interchangeable pieces of sufficient design to avoid the regulated definition. The plurality nevertheless draws an artificial line between, on the one hand, those parts that "can serve no useful purpose except the assembly of a firearm" or that have "no ostensible utility except to convert a gun into such a weapon," and, on the other hand, those parts that have "an obvious utility for those who want both a pistol and a regular rifle." *Ante*, at 512–513.

I cannot agree. Certainly the statute makes no distinction based on the "utility" of the extra parts. While the plurality prefers to view this silence as creating ambiguity, I find it only to signal that such distinctions are irrelevant. To conclude otherwise is to resort to "'ingenuity to create ambiguity'" that simply does not exist in this statute. *United States* v. *James,* 478 U. S. 597, 604 (1986), quoting *Rothschild* v. *United States,* 179 U. S. 463, 465 (1900). As noted by the Government, when a weapon comes within the scope of the "firearm" definition, the fact that it may also have a nonregulated form provides no basis for failing to comply with the requirements of the NFA. Brief for United States 13–14.

The Court today thus closes one loophole—one cannot circumvent the NFA simply by offering an unassembled collection of parts—only to open another of equal dimension—one

can circumvent the NFA by offering a collection of parts that can be made either into a "firearm" or an unregulated rifle. I respectfully dissent.

JUSTICE STEVENS, dissenting.

If this were a criminal case in which the defendant did not have adequate notice of the Government's interpretation of an ambiguous statute, then it would be entirely appropriate to apply the rule of lenity.[1]   I am persuaded, however, that the Court has misapplied that rule to this quite different case.

I agree with JUSTICE WHITE, see *ante*, at 523–524, and also with the plurality, see *ante*, at 511, that respondent has made a firearm even though it has not assembled its constituent parts.   I also agree with JUSTICE WHITE that that should be the end of the case, see *ante*, at 524, and therefore, I join his opinion.   I add this comment, however, because I am persuaded that the Government should prevail even if the statute were ambiguous.

The main function of the rule of lenity is to protect citizens from the unfair application of ambiguous punitive statutes. Obviously, citizens should not be subject to punishment without fair notice that their conduct is prohibited by law.[2]   The

---

[1] See, *e. g., Crandon* v. *United States*, 494 U. S. 152, 168 (1990) ("Finally, as we have already observed, we are construing a criminal statute and are therefore bound to consider application of the rule of lenity.   To the extent that any ambiguity over the temporal scope of [18 U. S. C.] § 209(a) remains, it should be resolved in petitioners' favor unless and until Congress plainly states that we have misconstrued its intent"); *Commissioner* v. *Acker*, 361 U. S. 87, 91 (1959) ("The law is settled that 'penal statutes are to be construed strictly,' . . . and that one 'is not to be subjected to a penalty unless the words of the statute plainly impose it' ") (citations omitted).

[2] Ambiguity in a *criminal* statute is resolved in favor of the defendant because " 'a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed' " and because "of the seriousness of criminal penalties, and because criminal punishment usually represents the moral con-

risk that this respondent would be the victim of such unfairness, is, however, extremely remote. In 1985, the Government properly advised respondent of its reading of the statute and gave it ample opportunity to challenge that reading in litigation in which nothing more than tax liability of $200 was at stake. See 924 F. 2d 1041, 1042–1043 (CA Fed. 1991). Moreover, a proper construction of the statute in this case would entirely remove the risk of criminal liability in the future.

The plurality, after acknowledging that this case involves "a tax statute" and its construction "in a civil setting," *ante*, at 517, nevertheless proceeds to treat the case as though it were a criminal prosecution. In my view, the Court should approach this case like any other civil case testing the Government's interpretation of an important regulatory statute. This statute serves the critical objective of regulating the manufacture and distribution of concealable firearms—dangerous weapons that are a leading cause of countless crimes that occur every day throughout the Nation. This is a field that has long been subject to pervasive governmental regulation because of the dangerous nature of the product and the public interest in having that danger controlled.[3] The public interest in carrying out the purposes that motivated the enactment of this statute is, in my judgment and on this record, far more compelling than a mechanical application of the rule of lenity.

Accordingly, for this reason, as well as for the reasons stated by JUSTICE WHITE, I respectfully dissent.

---

demnation of the community, [and therefore] legislatures and not courts should define criminal activity." *United States* v. *Bass,* 404 U. S. 336, 348 (1971).

[3] See, *e. g.,* Gun Control Act of 1968, 18 U. S. C. § 921 *et seq.;* Arms Export Control Act, as amended Pub. L. 94–329, 90 Stat. 744, 22 U. S. C. § 2778; *United States* v. *Biswell,* 406 U. S. 311, 316 (1972) (acknowledging that the sale of firearms is a "pervasively regulated business").