UNITED STATES of America, Plaintiff,

v.

ONE BIG SIX WHEEL, Defendant.

No. 97–CV–6500 (ARR).

United States District Court, E.D. New York.

Dec. 3, 1997.

Stephen Kelly, United States Atty's Office, Brooklyn, NY, for plaintiff.

ROSS, District Judge.

In a recent case involving the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA"), Pub.L. 104–132, 110 Stat.

1214, Justice Souter remarked, "All we can say is that in a world of silk purses and pigs' ears, the Act is not a silk purse of the art of statutory drafting." *Lindh v. Murphy,* —— U.S. ——, ——, 117 S.Ct. 2059, 2068, 138 L.Ed.2d 481 (1997). This case demonstrates how true this statement rings, as the court is called upon to discern the impact of a miscellaneous provision of the AEDPA on pre-existing section of the criminal code that deals with shipboard gambling. Over time, courts may derive much meaning from the 1996 enactment. With respect to this case, however, little is clear.

The shipboard gambling provision at issue here. 18 U.S.C. § 1081 (Supp.1997), is part of the Gambling Ship Act, codified at 18 U.S.C. §§ 1081–1084 (1984 & Supp.1997). Pursuant to the forfeiture provision of the Gambling Ship Act, 18 U.S.C. § 1082(c), and 28 U.S.C. § 2461(1994 & Supp.1997), the United States of America seeks the civil forfeiture of one Big Six Wheel, the defendant *in rem.* The Big Six Wheel is a gambling device on the *Liberty I,* a seagoing vessel leased and operated by Bay Casino, LLC ("Bay Casino"). Bay Casino operates gambling cruises–to–nowhere [1] from Sheepshead Bay in Brooklyn, New York. The United States and Bay Casino stipulate that on or about July 21, 1997, Bay Casino operated one or more gambling establishments, including one that made use of the defendant *in rem* Big Six Wheel, while *Liberty I* was situated more than three, but fewer than twelve, nautical miles from the shore of the United States. The United States claims that Bay Casino thereby operated a "gambling ship" in violation of the criminal proscription of the Gambling Ship Act,[2] and that the offending

---

1. The term "gambling cruise–to–nowhere" is used to describe a voyage that departs from and returns to the same port and which has as its principal purpose the provision of a venue for gambling. Throughout this opinion the term gambling cruise–to–nowhere is used interchangeably with the term "floating casino."

2. The Gambling Ship Act defines a "gambling ship" as a vessel used principally for the operation of one or more gambling establishments. 18 U.S.C. § 1081 (1984 & Supp.1997). A "gambling establishment" is

> any common gaming or gambling establishment operated for the purpose of gaming or

gambling, including accepting, recording, or registering bets, or carrying on a policy game or any other lottery, or playing any game of chance, for money or other thing of value. *Id.* Section 1082 provides that:

> (a) It shall be unlawful for any citizen or resident of the United States, or any other person who is on an American vessel or is otherwise under or within the jurisdiction of the United States, directly or indirectly—
>> (1) to set up, operate, or own or hold any interest in any gambling ship or any gambling establishment on any gambling ship; or
>> (2) in pursuance of the operation of any gambling establishment or any gambling ship, to

Big Six Wheel is therefore subject to forfeiture. Bay Casino has moved to dismiss the civil forfeiture action, claiming that its gambling cruise–to–nowhere fits within the "covered voyage exception"[3] of the Gambling Ship Act. The United States for its part argues that the AEDPA extended the territorial sea of the United States from three nautical miles to twelve nautical miles, and in the process effectively amended the Gambling Ship Act (18 U.S.C. § 1081) such that a ship must now sail beyond the twelve nautical mile mark before its gambling activities commence if it is to fit within the covered voyage exception. This case thus presents the question of whether a vessel used principally for the operation of one or more gambling establishments must travel beyond twelve nautical miles from the shore of the United States in order to fit within the covered voyage exception, or whether a distance of three nautical miles continues to suffice notwithstanding the enactment of AEDPA.[4] For the reasons stated below, this court is not prepared to conclude that the AEDPA changed the Gambling Ship Act's covered voyage exception from three to twelve nautical miles. Because the statute at issue is a criminal provision and the effect of the AEDPA is not clear, the court must apply the principle of lenity, which leads to resolution of ambiguity in favor of Bay Casino. *See United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517–18, 112 S.Ct. 2102, 2109–10, 119 L.Ed.2d 308 (1992). Bay Casino's motion to dismiss the forfeiture complaint is therefore granted.

### Statutory Background

The Gambling Ship Act was enacted in 1948 in response to the concern of a west coast state which prohibited gambling within its territory, but which was frustrated by the operation of commercial gambling ships in waters just beyond its jurisdiction. Water taxis ferried visitors between ship and shore so the gambling ship itself would not cross into the state's waters and thereby become subject to its jurisdiction. The Gambling Ship Act outlawed the operation of both the "floating casinos" and the water taxis that had brought passengers to the ships. *See* H.R.Rep. No. 102–242(I) (1991); H.R.Rep. No. 80–1700, *reprinted in* 1948 U.S.C.C.A.N. 1487.

Later, Congress became concerned with the toll that federal anti-gambling laws were taking on the U.S. cruise and shipbuilding industries. Foreign flag cruise ships were free to offer gambling beyond state waters, but their U.S. counterparts could not. To allow U.S. flag ships to offer gambling to their guests in the same manner as foreign flag ships, in 1992 Congress amended the Johnson Act, 15 U.S.C. §§ 1171–1178 (1982 & Supp.1997), and allowed U.S. flag ships to transport gambling devices. The 1992 amendment was not intended to alter the Gambling Ship Act, which prohibited the operation of vessels for the *principal purpose* of gambling. *See* H.R.Rep. No. 102–1092 (1992); 138 Cong. Rec. H68–02 (daily ed. Jan. 28, 1992); H.R.Rep. No. 102–357 (1991).

In 1994, however, Congress amended the Gambling Ship Act to permit, in effect, the operation of a vessel for the principal purpose of gambling. Specifically, the 1994 amendment added to the Gambling Ship Act (18 U.S.C. § 1081) a covered voyage exception that provided that the term "gambling ship" "does not include a vessel with respect

---

conduct or deal any gambling game, or to conduct or operate any gambling device, or to induce, entice, solicit, or permit any person to bet or play at any such establishment,

if such gambling ship is on the high seas, or is an American vessel or otherwise under or within the jurisdiction of the United States, and is not within the jurisdiction of any State.

18 U.S.C. § 1082(a) (1984).

**3.** Throughout this opinion, the phrase "covered voyage exception" refers to the portion of 18 U.S.C. § 1081 (Supp.1997) that provides that the term "gambling ship" "does not include a vessel with respect to gambling aboard such vessel be-

yond the territorial waters of the United States during a covered voyage (as defined in section 4472 of the Internal Revenue Code of 1986 as in effect on January 1, 1994)." The phrase "covered voyage definition" refers to the latter half of the covered voyage exception that includes the term "covered voyage" and the accompanying parenthetical reference to 26 U.S.C. § 4472.

**4.** The same issue is presented in a related case, *Bay Casino, LLC. v. Zachary Carter, United States Attorney for the Eastern District of New York*, 97–CV–6069, in which Bay Casino seeks a declaratory judgment and injunctive relief.

to gambling aboard such vessel beyond the territorial waters of the United States during a covered voyage (as defined in section 4472 of the Internal Revenue Code of 1986 as in effect on January 1, 1994)." Under § 4472 of the Internal Revenue Code of 1986 (the "Code"), the term "covered voyage" includes a "voyage of ... a commercial vessel transporting passengers engaged in gambling aboard the vessel beyond the territorial waters of the United States, during which passengers embark or disembark the vessel in the United States." 26 U.S.C. § 4472 (Supp. 1997). An interpretive regulation of the Internal Revenue Service indicates that

> For purposes of sections 4471 and 4472, the territorial waters of the United States are those waters within the international boundary line between the United States and any contiguous foreign country or within 3 nautical miles (3.45 statute miles) from low tide on the coastline.

26 C.F.R. § 43.4472–1 (1997). This regulation, setting U.S. territorial waters at the three nautical mile mark has remained constant from January 1, 1994 (the date to which 18 U.S.C. § 1081 refers), through the date that Congress amended 18 U.S.C. § 1081, and remains unchanged today.

The government does not contest that at the time Congress created the covered voyage exception in 1994, it was understood that one could lawfully operate a "gambling ship" so long as no gambling took place while the ship was within three nautical miles of the U.S. coastline.[5] Such an understanding in 1994 was not surprising in light of the centuries–long history of the use of the term "territorial waters" to include the area of sea extending three nautical miles from the U.S. coast. Secretary of State Thomas Jefferson established the three mile limit in 1793 in order to place the coast out of cannon range, and that limit remained undisturbed by Congress for some 200 years. *See, e.g.,* H.R.Rep. No. 102–843(I) (1992); H.R.Rep.

No. 89–2086, *reprinted in* 1966 U.S.C.C.A.N. 3232; *see also Cunard S.S. Co. v. Mellon,* 262 U.S. 100, 122, 43 S.Ct. 504, 507, 67 L.Ed. 894 (1923) ("It now is settled in the United States and recognized elsewhere that the territory subject to its jurisdiction includes ... a marginal belt of sea extending from the coast line outward a marine league, or three geographic miles.").

The first sign that the three nautical mile conception of the territorial sea might change came in 1988 with a Proclamation of President Ronald Reagan, stating that "[t]he territorial sea of the United States henceforth extends to twelve nautical miles from the baselines of the United States determined in accordance with international law." 43 U.S.C. § 1331 (Supp.1997). This presidential proclamation came in response to the international legal community's recognition that a coastal nation could extend its territorial sea up to a limit of twelve nautical miles. *See* Convention on the Law of the Sea, Dec. 10, 1982, arts. 2 & 3 (*reprinted in* E.C. Benedict, Benedict on Admiralty, Doc. 10–6, at 10–78.3 (Frank L. Wiswall, Jr. ed., 1995)).

The presidential proclamation had only limited legal effect, however.[6] Congress had to enact legislation in order to implement the expansion of the territorial sea with respect to existing law. *See, e.g.,* H.R.Rep. No. 105–236, Title III (1997) (indicating that "while the President has the authority to expand our territory and sovereignty, only Congress has the authority to exercise legislative jurisdiction" and indicating that unamended laws have been enforced only to the three nautical mile limit); H.R.Rep. No. 102–843(I) (1992) (discussing bill intended to extend U.S. sovereignty to twelve nautical miles and corresponding extension of application of certain maritime laws, and noting need for implementing legislation to expand beyond three miles the geographic scope and effect of existing statutes using term "territorial sea").

---

5. Although the government does not dispute the contemporaneous understanding of the term "territorial waters," it argues that the statutory phrase was intended to be infused with new meaning with each redefinition of the boundaries of the United States territorial sea. This argument is addressed below.

6. The proclamation indicated that it was not intended to "extend[ ] or otherwise alter[ ] existing Federal or state law or any jurisdiction, rights, legal interests, or obligations derived therefrom." 43 U.S.C. § 1331 (1997 Supp.).

One such piece of legislation implementing the twelve-mile limit was a miscellaneous provision of the AEDPA of 1996. That provision of the AEDPA, § 901, is entitled "Territorial Sea Extending to Twelve Miles Included in Special Maritime and Territorial Jurisdiction." It added the following to the Historical and Statutory Notes of 18 U.S.C. § 7:

"The Congress declares that all the territorial sea of the United States, as defined by Presidential Proclamation 5928 of December 27, 1988 [set out as a note under section 1331 of Title 43, Public Lands], for purposes of Federal criminal jurisdiction is part of the United States, subject to its sovereignty, and is within the special maritime and territorial jurisdiction of the United States for the purposes of title 18, United States Code [this title]."

18 U.S.C. § 7 (Supp.1997); Pub.L. 104–132, 110 Stat. 1214, 1317 (1996).

## Discussion

The United States seeks forfeiture of the Big Six Wheel based on Bay Casino's gambling activities aboard *Liberty I* beyond three nautical miles, but within twelve nautical miles of the shore. In so doing, the government asks this court to conclude that § 901 of the AEDPA extended the territorial waters of the United States in a manner that concurrently altered § 1081's covered voyage exception to the Gambling Ship Act and thereby rendered illegal Bay Casino's operation of a gambling establishment more than three, but fewer than twelve nautical miles from the United States shore.

Essentially, the government argues that, with respect to Title 18 of the United States Code, the AEDPA effected a blanket extension of the U.S. territorial sea and territorial waters [7] from three to twelve nautical miles. According to this theory, since the enactment of the AEDPA, the Gambling Ship Act (18 U.S.C. § 1081) should no longer be read to exempt "a vessel with respect to gambling aboard such vessel beyond the territorial waters of the United States," that is, three nautical miles, as was previously the case.

Rather, it should now be read to exempt "a vessel with respect to gambling aboard such vessel beyond the territorial waters of the United States," that is, twelve nautical miles. As for the portion of 18 U.S.C. § 1081 that refers to a "covered voyage" and to its definition in § 4472 of the Code, the government argues that § 1081's reference was not intended permanently to incorporate the Internal Revenue Service regulation interpreting § 4472. In any event, the government contends that such a 1994 adoption of a three nautical mile definition of territorial waters is effectively overridden by the AEDPA's subsequent adoption of a twelve nautical mile territorial sea. For this argument to prevail, however, the United States must clear a number of interpretive hurdles, and the court concludes that it has not succeeded in doing so.

For the court to accept the government's position that Bay Casino's July 21, 1997 operation of a gambling cruise-to-nowhere violated the Gambling Ship Act (18 U.S.C. § 1082(a)), it must find all of the following: (1) that § 901 of the AEDPA extended the jurisdictional reach of the entire federal criminal code to twelve nautical miles; (2) that § 901 of the AEDPA changed the meaning of the phrase "territorial waters," setting the boundary at twelve nautical miles wherever those words are found in Title 18, regardless of whether they serve only a jurisdictional function or instead govern whether a specific act is criminal, (3) that even if Congress intended in 1994 to adopt the three nautical mile definition promulgated with respect to § 4472 of the Code, that decision was effectively superseded by the enactment of the AEDPA in 1996, at which time § 901 redefined the meaning of "territorial waters" found in 26 U.S.C. § 4472 as incorporated in the Gambling Ship Act (18 U.S.C. § 1081); and (4) that these effects of § 901 of the AEDPA are sufficiently apparent that a person of common intelligence, who seeks to behave in a lawful manner, would understand that the operation of a floating casino between three and twelve nautical miles is now criminal. The court is not convinced both that the effect of § 901 of the AEDPA is as

---

7. The term "territorial waters" includes the internal waters of the United States, such as lakes and rivers, as well as the territorial sea. *See, e.g.,*

*AT & T v. M/V Cape Fear,* 967 F.2d 864, 874 n. 12 (3d Cir.1992) (citations omitted).

broad as the government contends *and* that a typical law-abiding individual would be able to understand that § 1081's covered voyage exception no longer applies between three and twelve nautical miles.

## I. Does § 901 of the AEDPA extend the jurisdictional reach of the entire federal criminal code?

The government and Bay Casino seem to agree that the AEDPA extended the jurisdictional reach of the federal criminal code to twelve nautical miles. The court will therefore assume, without deciding, that § 901 of the AEDPA did sweep within its ambit all of Title 18 for jurisdictional purposes.[8] The question now before the court is what change, if any, this enactment produced with respect to the Gambling Ship Act (18 U.S.C. § 1081).

## II. Does § 901 of the AEDPA change the meaning of "territorial waters" not only for jurisdictional purposes, but also for purposes of making certain activities criminal?

Bay Casino argues that the AEDPA extended the territorial sea for purposes of

federal jurisdiction only. According to Bay Casino, in enacting the AEDPA, Congress intended to expand the prosecutorial capacity of the United States such that it could reach criminal acts committed between three and twelve nautical miles, but Congress did not intend to make into crimes acts that were previously lawful. The government, on the other hand, insists that § 901 of the AEDPA expanded the territorial sea for all criminal law purposes. According to the United States, the AEDPA not only expanded federal criminal jurisdiction, but also changed the definition of territorial waters wherever it appears in Title 18, even if the effect is to criminalize previously legal conduct.

The problem with the government's argument is that nothing in the language of § 901 suggests this broader reading, at least in any clear way. In § 901, Congress has specified that the territorial sea, extended out to twelve nautical miles, is part of the United States "for purposes of Federal criminal jurisdiction." It is not apparent from this provision that Congress intended in addition to change the substance of what constitutes a

8. Although Bay Casino appears to have conceded that the AEDPA extended the jurisdictional reach of the entire federal criminal code, it is possible that § 901 accomplished a more limited result—extending the "special maritime and territorial jurisdiction of the United States." The "special maritime and territorial jurisdiction of the United States" is a statutorily created jurisdictional base linked to the federal enclave statutes. "The federal enclave laws are a group of statutes that permits the federal courts to serve as a forum for the prosecution of certain crimes when they occur within the '[s]pecial maritime and territorial jurisdiction of the United States,' 18 U.S.C. § 7; this jurisdiction includes federal land, and property such as federal courthouses and military bases." *United States v. Markiewicz*, 978 F.2d 786, 797 (2d Cir.1992). Among the crimes defined by the federal enclave laws are murder (18 U.S.C. § 1111), manslaughter (18 U.S.C. § 1112), arson (18 U.S.C. § 81), assault (18 U.S.C. § 113), kidnaping (18 U.S.C. § 1201(a)(2)), maiming (18 U.S.C. § 114), and receiving stolen property (18 U.S.C. § 662).

The heading of § 901 of the AEDPA refers only to the "special maritime and territorial jurisdiction," and the text of this change appears in 18 U.S.C. § 7, which defines the term "special maritime and territorial jurisdiction of the United States." The only reference to this provision in

the legislative history of the AEDPA indicates that § 901 "codifies the extension of United States territorial sea, as defined by a 1988 Presidential Proclamation. This area would then be included within the special maritime and territorial jurisdiction of the U.S. for purposes of the criminal law." H.R. Conf. Rep. No. 104–518, Title IX (1996), *reprinted in* 1996 U.S.C.C.A.N. 924, 944. Such a narrow reading of this enactment would still allow for the expanded coverage of at least 29 criminal laws within Title 18 alone. (It might also explain why, despite the AEDPA's § 901, Congress felt the need to indicate explicitly in 18 U.S.C. § 2332b, a criminal statute also enacted as part of the AEDPA, that the territorial sea extends twelve nautical miles from the baseline of the United States.) This is not to say that the parties have misinterpreted the reach of § 901; at least one commentator has argued for such a broad reading. *See* David G. Dickman, Criminal Law Issues Associated with Enforcement of Environmental Laws by the United States Coast Guard, SB43 ALI–ABA 129, 146–48 (May 8, 1997). This issue is noted merely to indicate that the reach of § 901 may be subject to an interpretation not put forth by either of the parties. Because the parties have neither raised nor briefed the issue and the court can reach its conclusion without deciding the issue, the broader interpretation of § 901 will be assumed for the purpose of resolving the current dispute.

crime under Title 18. To the contrary, inferring such an intent would seem to read the phrase "for purposes of Federal criminal jurisdiction" out of the statute. Nor does the legislative history of the AEDPA support a conclusion that Congress intended this miscellaneous provision as anything more than an expansion of the territorial sea for a purely jurisdictional purpose. If Congress meant both to expand the jurisdictional reach of its criminal proscriptions *and* to change the meaning of the term "territorial waters" that underlies the substantive definition of criminal behavior, it is unlikely that it would have done so as cryptically as the government suggests.[9]

The government argues that the distinction between "territorial waters" as a jurisdictional and as a definitional concept is illusory. In effect, the government argues (without providing any example) that any expansion of the territorial waters necessarily converts some previously lawful conduct into crimes, and that Bay Casino is mistaken in arguing that the AEDPA did not convert previously lawful gambling (beyond three nautical miles) into unlawful gambling (because it is not beyond twelve nautical miles).

This argument overlooks the fact that there are real distinctions between a jurisdictional element of a crime and a substantive element. The distinction important in this case is that a jurisdictional element does not define the *essence* of what constitutes a criminal offense, and does not contribute to the culpability of the proscribed conduct. Hence, it is well settled that, unlike the factual underpinnings of the substantive elements of a crime, which generally require proof of *mens rea, see Staples v. United States,* 511 U.S. 600, 605–06, 114 S.Ct. 1793, 1796–97, 128 L.Ed.2d 608 (1994), " 'the existence of the fact that confers federal jurisdiction need not be one in the mind of the actor at the time he perpetrates the act made criminal by the federal statute.' " *United States v. Yermian,* 468 U.S. 63, 68, 104 S.Ct. 2936, 2939, 82 L.Ed.2d 53 (1984) (quoting *United States v. Feola,* 420 U.S. 671, 676–77 n. 9, 95 S.Ct. 1255, 1259–60 n. 9, 43 L.Ed.2d 541 (1975)); *see, e.g., United States v. Garcia,* 854 F.2d 340, 344 (1988) (requirement of transporting victim in interstate or foreign commerce was inserted simply to assure federal jurisdiction under Congress's commerce power and was not an element of substantive crime itself; "it is 'the involuntariness of seizure and detention which is the very essence of the crime of kidnapping.' ") (citation omitted); *United States v. Bryant,* 766 F.2d 370, 375 (8th Cir.1985) ("The interstate nature of the communication does not make the fraud more culpable. Thus, whether or not a defendant knows or can foresee that a communication is interstate, the offense is still every bit as grave in the moral sense.").[10]

In the statutory scheme set forth in the Gambling Ship Act (18 U.S.C. § 1081), the term "territorial waters" is an essential element of the substantive definition of the criminal activity. In other words, if one operates a floating casino within the territorial waters, one violates the criminal proscription of the Gambling Ship Act (18 U.S.C. § 1082). If one operates a gambling establishment beyond the territorial waters, one does not engage in criminal activity. Because the meaning of the term "territorial waters" controls whether gambling is a criminal activity under 18 U.S.C. §§ 1081 and 1082, the government's argument conflating jurisdiction and substance is facile. The court cannot conclude that Congress's clearly expressed intent to expand federal criminal

---

**9.** The government's interpretation raises an additional problem related to notice. *See infra* Section IV.

**10.** An example that may highlight the distinction between jurisdiction and substance in this respect is found in 18 U.S.C. § 1111 (Supp.1997), which defines murder and provides for the punishment of murder committed within the "special maritime and territorial jurisdiction of the United States." Here, "special maritime and territorial jurisdiction" is a jurisdictional element that the prosecution must demonstrate to justify federal jurisdiction over this kind of crime. Obviously this jurisdictional component of the statutory provision does not define the essence of the criminal act. The substance of the crime is the unlawful killing. The location of the homicide on a military base or on a boat between three and twelve miles from shore is not what makes the killing a morally culpable act. Therefore, lack of knowledge of the existence of the jurisdictional element does not render the murder statute a trap for the unwary.

jurisdiction was accompanied by a clear intent to amend also the substantive elements of what constitutes a gambling violation under 18 U.S.C. §§ 1081 and 1082.

### III. Does § 901 of the AEDPA amend the meaning of "covered voyage" within the Gambling Ship Act?

Even if the court were to accept the government's argument that the AEDPA's addition to 18 U.S.C. § 7 changes the meaning of "territorial waters" wherever it appears in Title 18, regardless of whether this produces a jurisdictional or substantive transformation of the law, the court would still have to determine the import of the express language in 18 U.S.C. § 1081 that specifies that the meaning of "covered voyage" is "defined in section 4472 of the Internal Revenue Code of 1986 as in effect on January 1, 1994." and it would still have to decide whether the AEDPA modified this definition.

The court begins this inquiry by returning to the relevant statutory provisions. Section 1081 of Title 18 provides that:

> The term "gambling ship" means a vessel used principally for the operation of one or more gambling establishments. Such term does not include a vessel with respect to gambling aboard such vessel beyond the territorial waters of the United States during a covered voyage (as defined in section 4472 of the Internal Revenue Code of 1986 as in effect on January 1, 1994).

The cross-referenced definition, 26 U.S.C. § 4472, in turn provides in relevant part that "[t]he term 'covered voyage' includes a voyage of . . . (ii) a commercial vessel transporting passengers engaged in gambling aboard the vessel beyond the territorial waters of the United States."

In 1994, when Congress incorporated the covered voyage definition of § 4472 of the Code into the Gambling Ship Act (18 U.S.C. § 1081), the Internal Revenue Service had already promulgated a regulation construing the terms of § 4472. *See* Final Regulations Regarding the Tax on Transportation by Water, 57 Fed.Reg. 33,635, 33,636–37 (1992) (codified at 26 C.F.R. pt. 43). This regulation, which remains in force to this day, provides that

> For purposes of sections 4471 and 4472, the territorial waters of the United States are those waters within the international boundary line between the United States and any contiguous foreign country or within 3 nautical miles (3.45 statute miles) from low tide on the coastline.

26 C.F.R. § 43.4472–1 (1997). Given the interplay of these provisions, the court must decide what effect, if any, the Internal Revenue Service regulation has on the construction of the covered voyage definition referenced in 18 U.S.C. § 1081. To guide this inquiry, the court relies on two rules of statutory construction.

The first of these rules is set forth in *Lorillard v. Pons:*

> Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change, *see Albemarle Paper Co. v. Moody,* 422 U.S. 405, 414 n. 8 [95 S.Ct. 2362, 2370 n. 8, 45 L.Ed.2d 280] (1975); *NLRB v. Gullett Gin Co.,* 340 U.S. 361, 366, [71 S.Ct. 337, 340–41, 95 L.Ed. 337] (1951); *National Lead Co. v. United States,* 252 U.S. 140, 147, [40 S.Ct. 237, 239, 64 L.Ed. 496] (1920); 2A C. Sands, Sutherland on Statutory Construction § 49.09 and cases cited (4th ed.1973). So too, where Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute.

434 U.S. 575, 580–81, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978); *see also Hassett v. Welch,* 303 U.S. 303, 312, 58 S.Ct. 559, 563, 82 L.Ed. 858 (1938) ("[T]he re-enactment of the Resolution of 1931 in the light of the administrative rulings requires the conclusion that Congress approved and adopted the administrative construction of the provision it re-enacted."). Because the Gambling Ship Act (18 U.S.C. § 1081) explicitly refers to § 4472 of the Code for the definition of "covered voyage," the Internal Revenue Service regulation is relevant, at the least, to the

court's construction of the referenced statutory terms.

■ A second rule of statutory construction provides that when a court interprets the effect of a statutory provision incorporated by reference, it should consider the form of incorporation Congress has employed. If Congress uses language indicating an intent to incorporate a specific portion of another statute, rather than merely to refer to the general law on a subject, then a stronger inference arises that Congress intended the incorporated provision to be construed in accordance with its meaning at the time of incorporation. *See, e.g, Hassett v. Welch,* 303 U.S. at 314, 58 S.Ct. at 564–65 (holding that where one statute incorporates provisions from another statute "by a specific and descriptive reference," the incorporated provision functions in the incorporating statute "as it exist[ed] at the time of adoption"); *Panama R. Co. v. Johnson,* 264 U.S. 375, 392, 44 S.Ct. 391, 396, 68 L.Ed. 748 (1924) (holding that incorporation by reference of one statute or system of statutes "serves to bring into the latter all that is fairly covered by the statute"). In the instant case, by expressly fixing the definition of "covered voyage" to its meaning "as in effect on January 1, 1994," Congress indicated that it was it was well aware that the meaning of that term might change from time to time by virtue of either legislative or administrative action, and that it was unwilling to make a blind investment in a future definition of the term.

Finally, the court notes that nothing in the scant legislative history of the covered voyage exception provides any real evidence that Congress intended anything else. What legislative history does exist accompanies a bill proposed in 1991, which, though similar to the 1994 amendment, was not passed. Nonetheless, citing to this legislative history in their briefs, both Bay Casino and the United States seem to agree that Congress intended the 1994 amendment to harmonize the criminal statute with a provision in the tax code that imposed a $3–per–passenger tax on commercial passenger voyages, including single-day voyages during which passengers gambled beyond the territorial waters, which extended three nautical miles. *See* H.R.Rep.

No. 102–242(I) (1991) (the "1991 House Report").

The 1991 House Report indicates that the covered voyage exception was proposed because confusion had arisen about whether the 1989 tax law (§§ 4471 and 4472 of the Code) taxed gambling on voyages that were technically outlawed by the federal criminal prohibitions on gambling first enacted by Congress in 1948, and codified at 18 U.S.C. §§ 1081–1084. Congress proposed adding the exception to the gambling statute "to clarify that [18 U.S.C. § 1081] does not cover ships on voyages covered by the 1989 tax law." *Id.* The amendment was intended to "reconcile the two statutes to make clear that the gambling voyages taxed as lawful commerce under Federal tax law are not prohibited under Federal criminal law." *Id.* This legislative history suggests that Congress was aware of the meaning of § 4472 of the Code when it referenced this provision in its amendment to the Gambling Ship Act (§ 1081), and supports the inference that Congress intended the covered voyage definition in the Gambling Ship Act to parallel the definition used in the Internal Revenue Code in order to ensure that taxable gambling voyages would not at the same time be considered criminal.

In sum, given the relevant statutory and regulatory language and taking into account traditional rules of statutory interpretation and the legislative history, it is far from clear that when Congress incorporated into the Gambling Ship Act the covered voyage definition of § 4472 of the Code by reference and without change, it did not also intend to incorporate the accompanying Internal Revenue Service regulation setting the covered voyage definition at three nautical miles.

■ The government posits that even if this was the intention of Congress when it amended the Gambling Ship Act in 1994, the expansion of jurisdiction effected in 1996 by § 901 of the AEDPA should be interpreted by the court to amend not only the phrase "territorial waters" as it appears in Title 18, but also the referenced covered voyage definition that appears in 26 U.S.C. § 4472. The argument is unpersuasive for two reasons. First, nothing in the 1996 Act evidences any

intent to alter § 4472 of the Code or its corresponding regulation. To the contrary, by its own terms, § 901 of the AEDPA is limited to Title 18. As such, it cannot unambiguously be read to amend or repeal any aspect of 26 U.S.C. § 4472 or its interpretive regulation, 26 C.F.R. § 43.4472–1. This is not to say that the court believes the 1992 regulation has greater force than the 1996 statute; the court simply cannot find evidence that it is likely, much less certain, that Congress intended the AEDPA to redefine the boundaries of the territorial sea with respect to 26 U.S.C. § 4472 or 26 C.F.R. § 43.4472–1 or to alter their effect on the meaning of the covered voyage definition in 18 U.S.C. § 1081. Second, reading the effect of the broad language of § 901 of the AEDPA as the government urges would be inconsistent with the principle of statutory construction counseling that when a statute dealing with a specific subject is in conflict with a later statute covering the same subject in a more general way, the specific provisions are interpreted to survive the implementation of the later statute. *See, e.g., Dalton v. Sherwood Van Lines, Inc.,* 50 F.3d 1014, 1018 (Fed.Cir.1995) ("It is a 'basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum' . . . .") (quoting *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 153, 96 S.Ct. 1989, 1992, 48 L.Ed.2d 540 (1976)). Because the Gambling Ship Act confines the meaning of the covered voyage definition to that "in effect on January 1, 1994," and because § 901 of the AEDPA does not expressly contradict an interpretation of the covered voyage exception that recognizes the three nautical mile definition of territorial waters then in effect, this rule runs counter to the government's argument that § 901 of the AEDPA overrides the Internal Revenue Service regulation.

Accordingly, the court has insufficient basis to conclude that the AEDPA changed the three nautical mile definition of "territorial waters" for purposes of the covered voyage definition of § 4472 of the Code as it is incorporated in the Gambling Ship Act at 18 U.S.C. § 1081. Thus, even if, as the government proposes, § 901 of the AEDPA is deemed to redefine the phrase "territorial waters" wherever it appears in Title 18, the covered voyage exception of the Gambling Ship Act would thereby be rendered internally inconsistent. The first half of the covered voyage exception would direct the reader to sail beyond twelve nautical miles before the commencement of gambling activities, and the latter half, which refers to § 4472 of the Code, would indicate that travel beyond three nautical miles will suffice.

Since even the government agrees that it is implausible that Congress intended "territorial waters" to mean twelve miles in the Gambling Ship Act and three miles in § 4472 of the Code as incorporated in 18 U.S.C. § 1081, the government would have the court conclude that "territorial waters means twelve miles in both places . . . ." Brief for the United States, at 26. Admittedly, an argument that Congress meant the portion of the covered voyage exception that appears to incorporate the three nautical mile definition to eclipse the segment that the government reads to mean twelve nautical miles is no stronger than an argument that twelve nautical miles implicitly supersedes three. In the context of a criminal statute, however, the court cannot resolve such ambiguity in favor of the government. If Congress intended to amend the covered voyage exception to criminalize the operation of a gambling ship between three and twelve nautical miles, a logical way to do so would have been to eliminate the former three nautical mile definition. Instead, Congress left untouched the reference to § 4472 of the Code, including its restriction to a meaning as of January 1, 1994.[11] The ambiguity that would therefore exist was

11. In effect, the government is contending that § 901 of the AEDPA repeals by implication the original meaning of the covered voyage exception. It is a longstanding rule of statutory construction, however, that repeals by implication are strongly disfavored. *See Felker v. Turpin,* 518

U.S. 651, ——, 116 S.Ct. 2333, 2338, 135 L.Ed.2d 827 (1996); *Hagen v. Utah,* 510 U.S. 399, 416, 114 S.Ct. 958, 968, 127 L.Ed.2d 252 (1994); *United States v. United Continental Tuna Corp.,* 425 U.S. 164, 168, 96 S.Ct. 1319, 1322–23, 47 L.Ed.2d 653 (1976).

without doubt unintended by Congress. But what *was* intended cannot be discerned. Accordingly, as discussed below, the principle of lenity bars this court from rewriting the end product in the manner suggested by the government.

## IV. The principle of lenity requires the court to resolve the ambiguity of the post-AEDPA meaning of the Gambling Ship Act's covered voyage exception against the government.

■ The lack of clarity with respect to the current meaning of the covered voyage exception leads the court to the conclusion that there is a fundamental flaw in the government's argument. Even if some individuals might have sufficient intellectual agility to leap the hurdles interspersed throughout the government's argument, the court must be convinced that such a new meaning is sufficiently apparent to a person of common intelligence that society should be willing to impose criminal sanctions, including imprisonment, upon any who have been operating floating casinos between three and twelve nautical miles since the enactment of the AEDPA. Although the government here seeks only forfeiture (itself a significant penalty). for the government to prevail, the court must find that it has a sufficient basis to justify the imposition of imprisonment for as long as two years. *See* 18 U.S.C. § 1082(b) (Supp.1997); *United States v. Thompson/Center Arms Co.,* 504 U.S. 505, 517–18, 112 S.Ct. 2102, 2109–10, 119 L.Ed.2d 308 (1992). In the end, this court cannot say that the trail from the AEDPA through § 7 of Title 18 to the Gambling Ship Act (18 U.S.C. § 1081) and § 4472 of the Code is sufficiently well marked that a person of common intelligence should be held criminally responsible if he does not reach the conclusion that once-legal gambling activities are now proscribed.

As the Supreme Court has long held, "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." In various ways over the years, we have stated that "when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." This principle is founded on two policies that have long been part of our tradition. First, "a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear." Second, because of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community legislatures and not courts should define criminal activity. This policy embodies "the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." Thus, where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant.

*United States v. Bass,* 404 U.S. 336, 347–48, 92 S.Ct. 515, 522–23, 30 L.Ed.2d 488 (1971) (citations and footnote omitted). The court cannot conclude that the government's post-AEDPA interpretation of the Gambling Ship Act (18 U.S.C. § 1081) is something "that the common world will understand." Even if the government is correct in its interpretation, the path to its conclusion (that the covered voyage exception now shelters only those floating casinos that operate beyond the twelve nautical mile mark) is too serpentine for most readers (including this court) to follow with any degree of confidence. The doubt regarding the scope of the AEDPA's § 901 and its effect on the Gambling Ship Act (18 U.S.C. § 1081) thus requires the court to invoke the principle of lenity.

The absence of any reliable indications that Congress intended the result urged by the government is particularly troubling in light of the fact that the government's interpretation would render criminal that which was previously legal conduct—that is, the operation of a floating casino between three and twelve nautical miles. First in 1992 and then in 1994, Congress progressively loosened restrictions on shipboard gambling. It appears from the legislative history that con-

siderable thought went into these enactments. *See, e.g.,* H.R.Rep. No. 102–1092 (1992); 138 Cong. Rec. H68–02 (daily ed. January 28, 1992); 137 Cong. Rec. H11021–04 (daily ed. November 23, 1991), H.R.Rep. No. 102–357 (1991); 137 Cong. Rec. H7995–03 (daily ed. October 17, 1991); H.R.Rep. No. 102–242, pt. 1 (1991). In reliance on these enactments, a floating casino industry has developed.[12] It would be surprising if, only two years after it created the covered voyage exception, Congress. without debate or explanation, decided to alter that exception in a manner that would have a highly negative impact on the industry. "Where offenses have been specifically defined by Congress and the public has been guided by such definitions for many years, it is not natural for Congress by general legislation to amend such definitions ... without making clear its intent to do so." *Williams v. United States,* 327 U.S. 711, 718, 66 S.Ct. 778, 782, 90 L.Ed. 962 (1946) (footnote omitted). The unjust effect of a contrary approach is magnified where, as here, Congress has recently taken affirmative steps to legalize the conduct. The complex and uncertain interaction of § 901 of the AEDPA and the Gambling Ship Act (18 U.S.C. § 1081) is not adequate to accomplish a reversal of Congress's legalization of the subject activities in 1992 and 1994. The principle of lenity requires the court to let the pre-AEDPA interpretation of the Gambling Ship Act's covered voyage exception stand.[13]

The application of lenity and the consequent resolution of the ambiguity of the post–AEDPA § 1081 in favor of Bay Casino is not merely the product of "a convenient maxim of statutory interpretation. Rather, it is rooted in fundamental principles of due process which mandate that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited." *Dunn v. United States,* 442 U.S. 100, 112, 99 S.Ct. 2190, 2197, 60 L.Ed.2d 743 (1979). The lenity principle is closely related to the constitutional promise of due process, as both are "manifestations of the fair warning requirement. . . ."

> [A]s a sort of "junior version of the vagueness doctrine," the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered. . . . [A]lthough clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope. In each of these guises, the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.

*United States v. Lanier,* —— U.S. ——, ——, 117 S.Ct. 1219, 1225, 137 L.Ed.2d 432 (1997) (citations omitted).

**12.** The president of Bay Casino has submitted an affidavit that provides information gathered from the Florida Day Cruise Association to document the industry's growth. According to this source, in Florida, over twenty–five ships carry approximately three million passengers each year, generate revenues over 140 million dollars, and employ thousands of people. *See* Kornblum Aff. ¶ 7.

**13.** In a footnote to its brief, the government argues that if the court finds that the covered voyage exception still applies at three nautical miles, then the gambling between three and twelve nautical miles would be prohibited under the Assimilated Crimes Act. 18 U.S.C. § 13 (1969 & 1997 Supp.). This Act adopts non-conflicting state law on federal enclaves. *See United States v. Lewis,* 92 F.3d 1371, 1373–74 (5th Cir.1996). If, as the court concludes, 18 U.S.C. § 1081 allows the operation of a gambling establishment between three and twelve nautical miles, then

state law prohibiting the same activity would be in conflict with the federal provision.

> The fact that the definition of this offense as enacted by Congress results in a narrower scope for the offense than that given to it by the State, does not mean that the Congressional definition must give way to the State definition. . . . The Assimilative Crimes Act has a natural place to fill through its supplementation of the Federal Criminal Code, without giving it the added effect of modifying or repealing existing provisions of the Federal Code.

*Williams v. United States,* 327 U.S. 711, 717–18, 66 S.Ct. 778, 781–82, 90 L.Ed. 962 (1946). Thus, the Assimilated Crimes Act cannot be invoked to expand the prohibition against shipboard gambling. If Congress has legalized gambling between three and twelve nautical miles, state law cannot make the same conduct illegal.

Thus, failure to apply lenity to an ambiguous criminal provision would raise due process concerns because the defendant would not have had fair warning regarding how the ambiguity would be resolved. This case aptly illustrates the due process problems that would arise in the absence of lenity. First, a powerful concern is raised by the government's argument that the term "territorial waters," as it appears in both the Gambling Ship Act (18 U.S.C. § 1081) and § 4472 of the Code, has no fixed meaning—that it is like a vessel, the content of which can change from time to time. With respect to § 4472 of the Code, this argument is difficult to accept because 26 C.F.R. § 43.4472–1 defines the term as it appears in that section, and this regulation marks the boundary at three nautical miles. It can hardly be said in this context that the average person would have a fair warning that the definition in 26 U.S.C. § 4472 is now twelve miles, especially since that change is not reflected in either the statute or its regulation.

Likewise, with respect to the Gambling Ship Act (18 U.S.C. § 1081), although it is true that the term is not explicitly defined in the statute, no one contends that prior to the AEDPA it meant anything but three nautical miles. The notion of a key substantive term that draws the line between permissible and unlawful conduct having no fixed meaning is troubling enough in the context of a criminal statute. When it is coupled with a theory that the change can be made in as obscure a manner as the government claims here, the theory becomes tantamount to an assertion that notice of criminality is of no significance.

This notice difficulty is exacerbated by the government's attempt to read an expansion of the territorial sea for the *explicit* purpose of broadening federal criminal jurisdiction to work a simultaneous *implicit* expansion for substantive purposes. It is difficult to say with confidence that a person of common intelligence could look to the change effected in § 7 of Title 18 by the AEDPA and know that not only does it do what it says—that is, expand the jurisdictional reach of federal

criminal law, but that it also does something it does not say—that is, change the meaning of "territorial waters" in a different statute such that the once legal conduct of gambling between three and twelve nautical miles is now proscribed. Furthermore, when one looks to the Gambling Ship Act itself, which one would consult to determine the legality of one's gambling operation on a ship. there is no indication that the definition of "territorial waters" has changed.[14]

These concerns about the lack of fair warning bolster the court's conclusion that there is not a sufficiently clear basis for accepting the government's argument that § 901 of AEDPA redefined the covered voyage exception of the Gambling Ship Act (18 U.S.C. § 1081). Lack of notice is in conflict with the "basic principle that a criminal statute must give fair warning of the conduct that it makes a crime." *Bouie v. City of Columbia*, 378 U.S. 347, 350, 84 S.Ct. 1697, 1701, 12 L.Ed.2d 894 (1964). As Justice Holmes observed, "it is not likely that a criminal will carefully consider the text of the law before he murders or steals;" yet our system of justice remains steadfast in its commitment to requiring fair warning for those who seek to conform their conduct to the confines of the law. *United States v. Hood*, 343 U.S. 148, 151, 72 S.Ct. 568, 569–70, 96 L.Ed. 846 (1952). Moreover, the need for fair warning is particularly acute in cases such as this one where the conduct at issue is not *malum in se*, but rather is legal in certain circumstances. With respect to operating a gambling cruise–to–nowhere "it is not unreasonable to imagine a citizen attempting to '[steer] a careful course between violation of the statute [and lawful conduct].'" *United States v. Bass*, 404 U.S. 336, 348 n. 15, 92 S.Ct. 515, 522–23 n. 15, 30 L.Ed.2d 488 (1971) (quoting *McBoyle v. United States, 283 U.S. 25, 27 (1931)* (Holmes, J.)). In fact, Bay Casino made such an attempt: believing that its operation would be legal, Bay Casino began conducting gambling cruises–to–nowhere after the enactment of the AEDPA only to face the threat of criminal prosecution after it had made a substantial investment in its

---

14. In fact, the only other provision to which the Gambling Ship Act (18 U.S.C. § 1081) refers is § 4472 of the Code, for which there is an interpretive regulation that continues to indicate that the territorial sea extends out to three nautical miles.

venture. For the sake of those, like Bay Casino, who seek to conduct themselves in a legally permissible manner, criminal laws must speak with clarity.

### Conclusion

As discussed above, the court cannot conclude that § 901 of the AEDPA amended 18 U.S.C. § 1081 in a manner sufficiently unambiguous to render illegal the previously lawful conduct of operating a gambling establishment between three and twelve nautical miles. It is not obvious that § 901 of the AEDPA changed the meaning of the term "territorial waters" everywhere that it appears in Title 18, even where such a redefinition would change the substance of what constitutes criminal activity. Nor is it apparent that § 901 of the AEDPA did anything to transform the definition of "territorial waters" as it is used in the incorporated provision of 26 U.S.C. § 4472, or that the regulation 26 C.F.R. § 43.4472–1 is now irrelevant. In construing a criminal statute such as 18 U.S.C. § 1081, the principle of lenity dictates that ambiguity be resolved against the government. For this reason, the court cannot accept the government's argument that the covered voyage exception no longer exempts from the proscription of 18 U.S.C. § 1082 the operation of a gambling establishment beyond three nautical miles. Until Congress speaks clearly to the contrary, the pre-AEDPA interpretation of 18 U.S.C. § 1081 must stand. Any other conclusion would pose serious due process concerns and would require this court to write the law, rather than interpret it.

Thus, Bay Casino's operation, on July 21, 1997, of a gambling establishment beyond three, but within twelve nautical miles of the coast fits within the covered voyage exception. Because Bay Casino did not violate the Gambling Ship Act, its Big Six Wheel is not subject to forfeiture. Bay Casino's motion to dismiss the forfeiture action of the United States is therefore granted.

The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.

