In the

# United States Court of Appeals
## For the Seventh Circuit

No. 23-3256

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAMOND M. RUSH,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 4:22-cr-40008 — **J. Phil Gilbert**, *Judge.*

ARGUED MAY 28, 2024 — DECIDED MARCH 10, 2025

Before JACKSON-AKIWUMI, LEE, and KOLAR, *Circuit Judges.*

KOLAR, *Circuit Judge.* Section 5861(d) of the National Firearms Act (NFA) criminalizes receipt or possession of certain unregistered firearms. 26 U.S.C. §5861(d). Defendant-Appellant Jamond Rush challenges his indictment and conviction under §5861(d), alleging that the statute unconstitutionally burdens core conduct protected by the Second Amendment. Because binding precedent forecloses Rush's argument, we affirm.

## I.    Background

In August 2022, Rush was charged by superseding indict-
ment with one count of possessing an unregistered firearm in
violation of 26 U.S.C. §§5841, 5861(d), and 5871. The unregis-
tered firearm Rush possessed was an Anderson Manufactur-
ing AR-15 rifle with a 7.5-inch barrel—a short-barreled rifle
regulated by the NFA, 26 U.S.C. §5801, *et seq.*[1]

Rush moved to dismiss the indictment, arguing that
§5861(d) is unconstitutional under the Supreme Court's deci-
sion in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1
(2022). The government opposed the motion, arguing that the
NFA remains constitutional under *Bruen*, and that earlier Su-
preme Court precedent, *United States v. Miller*, 307 U.S. 174
(1939), already upheld an analogous NFA regulation against
a Second Amendment challenge. The district court agreed
with the government, concluding that "*Bruen* had no impact
on the constitutionality of regulating the receipt or possession
[of] an unregistered short-barreled rifle." The district court
held that Rush's alleged conduct—possessing the unregis-
tered, short-barreled rifle—was not covered "by the plain text
or the historical understanding of the Second Amendment."

Rush then entered a conditional guilty plea, reserving the
right to challenge the denial of his motion to dismiss. He was
convicted and sentenced to 30 months' imprisonment. Rush
now appeals the district court's denial of his motion to dis-
miss.

---

[1] 26 U.S.C §5845(a) defines "firearm" to include "a rifle having a barrel
or barrels of less than 16 inches in length ...."

## II.    Discussion

We review questions concerning the constitutionality of a federal statute *de novo*. *United States v. Cote*, 504 F.3d 682, 685 (7th Cir. 2007). The single issue on appeal is whether §5861(d) is facially constitutional—if it is not, Rush's indictment must be dismissed. A facial challenge like the one Rush lodges "is the most difficult challenge to mount successfully because it requires a [party] to establish that no set of circumstances exists under which the [statute] would be valid." *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)) (cleaned up). Because we conclude that Rush's constitutional challenge to §5861(d) fails, his motion to dismiss was properly denied.

Originally passed by Congress in 1934, the NFA in its early form required that individuals register certain firearms, including some with short barrels. *Miller*, 307 U.S. at 175 n.1. Today, §5861(d) of the NFA provides: "It shall be unlawful for any person ... to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record...." 26 U.S.C. §5861(d). The current NFA only applies to specified firearms, including short-barreled rifles. The NFA also establishes taxes on making and transferring certain firearms, again including short-barreled rifles. 26 U.S.C. §§5811, 5821.

Rush argues §5861(d) is unconstitutional because it burdens core conduct protected by the Second Amendment. The Second Amendment instructs: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. Of course, "like most rights, the right secured by the Second Amendment is not unlimited." *Bruen*,

597 U.S. at 21 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)) (cleaned up).

Rush asserts that early Supreme Court precedent, *United States v. Miller*, does not control and that §5861(d) cannot pass constitutional muster under a post-*Bruen* analysis. We first address the question of whether *Miller* applies. Next, we turn to the related question of whether *Miller* is incompatible with *Bruen*.

### A. *United States v. Miller*

In *United States v. Miller*, the defendants were charged with unlawfully transporting an unregistered firearm—a shotgun with a barrel less than 18 inches in length—in inter-state commerce in violation of the NFA. 307 U.S. at 175. After examining early colonial laws that regulated musket length (e.g., muskets must "not [be] less than three feet, nine inches"), the Supreme Court determined that the Second Amendment does not guarantee a right to possess an unreg-istered, short-barreled shotgun. *Id*. at 175–76, 179–80, 183. Thus, *Miller* upheld the challenged NFA provision.

The government argues that *Miller* forecloses the relief Rush seeks because *Miller* upheld the constitutionality of §5861(d)'s predecessor, which also required the registration of certain short-barreled firearms. The government points out that a court of appeals must follow Supreme Court precedent that "has direct application in a case," even if that precedent "appears to rest on reasons rejected in some other line of de-cisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989).

We have recently reiterated this very principle. In *United States v. White*, we explained that "the Supreme Court has

instructed us to resist invitations to find its decisions overruled by implication." 97 F.4th 532, 539 (7th Cir. 2024) (citing *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023)). "When a Supreme Court decision is directly controlling, our job is to follow it, leaving to the Court the prerogative of overruling its own decisions." *Id.* (cleaned up). This is so even if "intervening decisions have eroded [the precedent's] foundation." *Id.* (citation omitted). Rush's case is no exception.

The rule of law demands we follow binding Supreme Court precedent. And, the Supreme Court's more recent Second Amendment jurisprudence does not reject *Miller* as Rush suggests, but rather directly engages with it. *Bruen*, 597 U.S. at 21 (citing *Heller*, 554 U.S. at 627, quoting *Miller*, 307 U.S. at 179, for the proposition that "prohibiting the carrying of dangerous and unusual weapons" is "fairly supported by the historical tradition" while the "Second Amendment protects the possession and use of weapons that are in common use at the time." (internal quotations omitted)).

Rush's attempt to factually distinguish *Miller* is unavailing. The fact that *Miller* involved an unregistered, short-barreled *shotgun* and Rush was convicted of possessing an unregistered, short-barreled *rifle* does not control the outcome of this appeal. Both are long guns with shortened barrels, which are dangerous because they are more powerful than traditional handguns yet are easier to conceal. *See Bianchi v. Brown*, 111 F.4th 438, 451 (4th Cir. 2024). And both involve a characteristic that makes the firearm especially attractive to criminals while adding little—if any—functionality to the firearm for lawful use. Perhaps more importantly, both were regulated under the NFA provisions in effect at the time of the defendants' convictions—provisions that simply required the

registration of the firearms. *See generally Bruen*, 597 U.S. at 56–57 (contrasting outright bans with fees). We see no reason to cabin *Miller's* holding and read it so narrowly.

In that vein, we understand *Miller*, and its subsequent treatment through *Bruen*, to emphasize two distinct features of Second Amendment jurisprudence. One, the type of weapon at issue is of critical importance. Weapons, like machine guns, that are "not typically possessed by law-abiding citizens for lawful purposes" remain unprotected. *Heller*, 554 U.S. at 625 (citing *Miller*); *see also Staples v. United States*, 511 U.S. 600, 611–12 (1994) (considering "machineguns, sawed-off shotguns, and artillery pieces" as "items the ownership of which would have … [a] quasi-suspect character."). And two, licensing regimes designed to ensure firearm applicants "are, in fact, law-abiding responsible citizens"—including those that impose some pecuniary cost on the applicants—are categorically different than weapons bans. *Bruen*, 597 U.S. at 38 n.9 (citation omitted). *Rahimi* and *Bruen* clarify the logic of *Miller* that onerous restrictions on weapons are distinct from licensing requirements of firearms. *Rahimi*, 602 U.S. at 699–700 (distinguishing constitutional licensing regulations that presume individuals have a right to carry a firearm from unconstitutional regimes that require applicants make a special showing of need); *Bruen*, 597 U.S. at 38 n.9 ("[N]othing in our analysis should be interpreted to suggest" registration laws "which often require applicants to undergo a background check or pass a firearm safety course" and do not impose "exorbitant fees" are unconstitutional.).

In sum, *Miller* "has direct application in [this] case," and we therefore follow it. *See Rodriguez de Quijas*, 490 U.S. at 484.[2] This alone is dispositive and brings Rush's challenge to a halt. But central to Rush's appeal is his assertion that §5861(d) fails under *Bruen*, and we therefore continue on to consider that framework. Bearing in mind that we leave to the Supreme Court the prerogative of overruling its own decisions, we do this not in the context of first impression, but rather with an eye for whether the test set forth in *Bruen* is incompatible with *Miller*. *See Mallory*, 600 U.S. at 136.

### B.  *Bruen* Analysis

In *Bruen*, the Court analyzed whether a state could require applicants for a public carry gun permit to demonstrate that they had a "special need" for self-protection distinguishable from that of the general community. *Id.* at 11–13. The Court explained that the Second Amendment's protection of the "right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense" extends to carrying "a handgun for self-defense outside the home." *Id*. at 8–10. Rush argues that *Bruen* compels us to find the licensing and taxing requirements of §5861 violate the Second Amendment. *Bruen*'s holding, however, was not so expansive as to overrule

---

[2] Our reading of *Miller* and its continuing validity is in agreement with our sister Circuits. *See, e.g.*, *Hanson v. District of Columbia*, 120 F.4th 223, 239 (D.C. Cir. 2024) (interpreting *Miller*'s central holding regulating weapons "capable of unprecedented lethality" as good law post-*Bruen*); *United States v. Price*, 111 F.4th 392, 400 (4th Cir. 2024) ("Nothing in *Bruen* abrogated" the proposition that weapons not commonly used for a lawful purpose "such as short-barreled shotguns" could be regulated.) (citation omitted).

*Miller*, nor does the test laid out in *Bruen* call into question *Miller's* core holding or continued validity.

*Bruen* set forth a two-step test for evaluating the constitutionality of a statute under the Second Amendment. *Id.* at 24. The *Bruen* framework directs us to first answer whether "the Second Amendment's plain text covers an individual's conduct" (such as possessing, receiving, or carrying a certain firearm within a particular place). *Id.* If it does, the Constitution presumptively protects that conduct. *Id.* We must then ask whether the challenged regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id.* The government bears the burden on the second step. *Id.*

So, in relation to Rush's challenge, we ask (1) whether the text of the Second Amendment covers the possession of an unregistered, short-barreled rifle, and if so, (2) whether §5861(d) of the NFA is consistent with the country's historical tradition of firearm regulation. We take each step in turn and stress once again that we take these steps not on a blank slate, but rather to see if recent Supreme Court cases overruled *Miller*.

### i.    Step One

The Second Amendment generally protects the right of "the people" to "keep and bear arms." U.S. CONST. amend. II. The natural next questions become who are "the people," what is an "arm," and what does it mean to "keep and bear" them? The parties do not dispute that Rush—an ordinary, law-abiding, adult citizen—is part of the "people" under the Second Amendment. *Bruen*, 597 at 31–32. We thus look to whether the firearm at issue—a short-barreled rifle—falls

within the scope of "arms" that individuals are entitled to "keep and bear."[3]

We may look beyond colonial-era firearms, because while the "Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Bruen*, 597 U.S. at 28. As we recognized in *Bevis v. City of Naperville*, "[t]his presents a line-drawing problem." 85 F.4th 1175, 1181–82 (7th Cir. 2023). While a personal handgun carried for self-defense is an "arm" that law-abiding citizens are free to "keep and bear," and a nuclear weapon is not, "[m]any weapons ... lie between these extremes." *Id.* at 1182.

Rush argues that the text of the Second Amendment extends to all "bearable" arms and thus his possession of a short-barreled rifle falls neatly within its ambit. Here, Rush's argument is contrary to our own precedent. In *Bevis*, we confronted this very issue, explaining that "bearable" must mean more than "transportable" or "capable of being held." *See Bevis*, 85 F.4th at 1193 (describing how a machine gun is literally a "bearable arm" in that it can be physically "pick[ed] up and carr[ied]" yet is not constitutionally protected (citing *Heller*, 554 U.S. at 624, 627)). *Bruen* reaffirmed that "the right [to bear arms] [i]s not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 626). Instead, the Second Amendment protects the right of an ordinary, law-abiding citizen to possess a firearm "in common use" for a

---

[3] *Bruen* does not address which party bears the burden on step one, and the parties disagree on this point. Because Rush's challenge fails regardless of burden, we do not decide this issue.

lawful purpose like self-defense. *Id*. at 32 (quoting *Heller*, 554 U.S. at 627). As we discuss in greater detail on *Bruen*'s second step, this is supported by "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons....'" *Id.* at 21 (quoting *Heller*, 554 U.S. at 627).

In *Bevis*, for instance, we concluded that the state had a strong likelihood of success on the merits (as required at the preliminary injunction stage) in showing that its regulation of assault weapons and high-capacity magazines was constitutional because such weapons were not within "the class of Arms protected by the Second Amendment." 85 F.4th at 1182. In surveying the evolution of Second Amendment jurisprudence, we recognized that the Second Amendment does not protect weapons that are not typically "possessed by law-abiding citizens for lawful purposes, *such as short-barreled shotguns*" and that this "accords with the historical understanding of the scope of the right." *Id.* at 1193 (emphasis added) (quoting *Heller*, 554 U.S. at 625). Here, the majority opinion in *Bevis* found agreement with the dissent. *Id.* at 1223 (Brennan, J., dissenting) (restating that *Miller* means the "Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." (quoting *Heller*, 554 U.S. at 625)).

Thus, this court—post-*Bruen*—acknowledged the Supreme Court's recognition that short-barreled shotguns fall on the constitutionally unprotected side of the "bearable arms" line because they are not in common use for a lawful purpose—which, at its core, is self-defense. *Bevis*, 85 F.4th at 1193 (citing *Heller*, 554 U.S. at 624–25). No intervening Supreme Court case has called *Bevis* into doubt, and this court

has not overruled it.[4] We therefore afford *Bevis* "considerable weight" and will not overturn circuit precedent based on the arguments Rush advances. *See Russ v. Watts*, 414 F.3d 783, 788 (7th Cir. 2005).

The government, for its part, contends that a short-barreled rifle is not an "arm" within the meaning of the Second Amendment because it is "dangerous and unusual" and therefore falls outside the scope of constitutional protection. Indeed, as previewed, long guns with shortened barrels are often considered dangerous because they are "more easily concealable than long-barreled rifles" and unusual because they "have more destructive power than traditional handguns, making them particularly desirable to malefactors and crooks." *Bianchi*, 111 F.4th at 451 (citation omitted). Rush argues that short-barreled rifles are in common use today, but he does not specifically connect that alleged common use to a lawful purpose like self-defense. More on that to come.

The government contends that Rush's claim fails on step one for an additional reason—the NFA's registration and taxation requirements are not "infringements" on Second Amendment rights. Recall that §5861(d) does not ban short-barreled rifles—it merely establishes a registration and taxation scheme applicable to them. The Supreme Court has

---

[4] We note that the *Bevis* plaintiffs' petition for a writ of certiorari was denied by the Supreme Court in July 2024. *Harrel v. Raoul*, 144 S. Ct. 2491, 2492 (2024). Justice Alito would have granted the petition. *Id.* In addition, Justice Thomas expressed that "[i]t is difficult to see how the Seventh Circuit could have concluded that the most widely owned semiautomatic rifles are not 'Arms' protected by the Second Amendment." *Id.* at 2492–93 (Thomas, J., statement respecting the denial of certiorari). Nevertheless, *Bevis* remains good law and we adhere to circuit precedent.

signaled approval of regimes that require applicants to un-
dergo background checks or pass firearm safety courses.
*Bruen*, 597 U.S. at 38 n.9 ("[N]othing in our analysis should be
interpreted to suggest the unconstitutionality of the 43 States'
'shall-issue' licensing regimes ... which ... are designed to en-
sure only that those bearing arms in the jurisdiction are, in
fact, 'law-abiding, responsible citizens.'" (first quoting *Drake
v. Filko*, 724 F.3d 426, 442 (3d Cir. 2013) (Hardiman, J., dissent-
ing); and then quoting *Heller*, 554 U.S. at 635). For purposes of
a facial challenge—and with Rush advancing no arguments
that he applied for a license, or necessarily would have been
denied one—we are forced to accept that §5861(d) does not
prevent ordinary, law-abiding adult citizens from obtaining
the necessary license and lawfully owning a short-barreled ri-
fle. Section 5861(d) merely requires them to register the fire-
arm and pay the accompanying tax. Stated differently, the
registration requirement can be read as a condition of lawful
possession, and not a Second Amendment infringement in the
first instance. And, as *Bruen* recognized, even "arms" within
the meaning of the Second Amendment may be regulated, so
long as the regulation is "part of an enduring American tradi-
tion of state regulation." *Bruen*, 597 U.S. at 69.

In any event, we decline to make a step one finding that
short-barreled rifles are "arms" protected by the Second
Amendment's text—at least not on this occasion under the
theories presented by Rush. The record does not show such
firearms are commonly used by ordinary, law-abiding citi-
zens for a lawful purpose like self-defense. *Bruen*, 597 U.S. at
32. More precisely, we are not convinced that *Bruen* spoke to
this issue in a manner that overrules *Miller*, and that is all we
must decide for this appeal. We turn to step two in our *Bruen*
analysis in the interest of completeness. As discussed below,

even if short-barreled rifles were "arms" within the meaning of the Second Amendment, historical tradition likely supports regulating them.

### ii.    Step Two

Our job in step two is to determine whether §5861(d) is consistent with the country's historical tradition, and the government bears the burden of identifying a relevant historical analogue for the modern-day regulation. *Bruen*, 597 U.S. at 29–30. Specifically, we consider "whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Id*. at 27 (citing *Heller*, 554 U.S. at 631).

"[T]he search is for a historical regulation that is *relevantly similar*, not identical." *Bevis*, 85 F.4th at 1191 (emphasis in original). Even if the modern-day regulation is not "a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster"—we need not find a historical "twin." *Bruen*, 597 U.S. at 30. Then, the question becomes whether the modern and historical regulations "impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified"—in other words, why and how a regulation burdens the Second Amendment right. *Id*. at 29. Comparing the "[w]hy and how" of past regulations to a challenged one is "central" to the *Bruen* inquiry. *Rahimi*, 602 U.S. at 692. When the historical laws "address[ed] particular problems" there is a good chance "contemporary laws imposing similar restrictions for similar reasons" are also permissible. *Id.* The laws do not need to "precisely match"—the contemporary one must only "comport with the principles underlying the Second Amendment...." *Id.*

The government points to numerous historical regulations on barrel length, regulations on firearms trade, registration and taxation requirements, and regulations on dangerous and unusual weapons. For example, a 1649 Massachusetts law, cited in *Miller*, required musketeers to carry a "good fixed musket ... not less than three feet, nine inches, nor more than four feet three inches in length...." *Miller*, 307 U.S. at 180. Also cited in *Miller* is a 1785 Virginia law regulating the length of militia members' firearms, providing that "[e]very non-commissioned officer and private" shall be equipped "with a good, clean musket carrying an ounce ball, and three feet eight inches long in the barrel...." *Id.* at 181. While some early laws appear specific to militia members, they are often relevant because the traditional militia was formed from a pool of men bringing arms "in common use at the time" for lawful purposes. *Bevis*, 85 F.4th at 1193 (quoting *Heller*, 554 U.S. at 624). Thus, many historical analogues concerning regulation of firearms that militia members were directed to keep are instructive (although certainly not dispositive).

There were also colonial and post-colonial laws akin to modern-day registration and taxation requirements. For instance, a 1631 Virginia law required recording "arms and munitions," and certain colonial "muster" laws required registration of arms into the 1800s.[5] Moving well past ratification of the Constitution, an 1856 North Carolina law imposed a tax

---

[5] Robert J. Spitzer, *Gun Law History in the United States and the Second Amendment Rights*, 80 LAW & CONTEMP. PROBS. 55, 74–76 (2017); Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 147–48, 161 (2007); *see also United States v. Holton*, 639 F. Supp. 3d 704, 711–12 (N.D. Tex. 2022).

of "one dollar and twenty five cents" on "every pistol, except such as are used exclusively for mustering...."[6] These are but a few of the analogous historical laws cited by the government.

Rush recognizes that §5861(d) mandates compliance with the NFA's "taxation and registration" requirements—requirements that have been upheld as a valid exercise of legislative taxing authority. *Sonzinsky v. United States*, 300 U.S. 506, 514 (1937) (NFA's taxing scheme is "within the national taxing power"); *see also United States v. Moses*, 513 F.3d 727, 732 (7th Cir. 2008) (observing that although "a violation of §5861(d) necessarily involves the possession of a firearm, the crime is more aptly characterized as a form of tax evasion."); *United States v. Lim*, 444 F.3d 910, 913 (7th Cir. 2006) ("Having required payment of a transfer tax and registration as an aid in collection of that tax, Congress under the taxing power may reasonably impose a penalty on possession of an unregistered firearm." (quoting *United States v. Gresham*, 118 F.3d 258, 262 (5th Cir. 1997))). But, says Rush, regulations that "taxed or registered" short-barreled arms did not exist during the Founding Era. Not so.

As an initial matter, the government is not constrained to only Founding Era laws. While not every time period is weighed equally, *Bruen* instructs us to consider "historical precedent from before, during, and even after the founding...." *Bruen*, 597 U.S. at 27. Of course, because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*[,]" we give

---

[6] An Act Entitled "Revenue," 1856 N.C. Sess. Laws 34, chap. 34, §2, pt. 4.

considerable weight to the time periods immediately leading up to and during the adoption of the Second Amendment in 1791. *Id.* at 34 (emphasis in original) (quoting *Heller*, 554 U.S. at 634–35); *see also id.* at 81–83 (Barrett, J., concurring) (cautioning against "freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the" Second Amendment).

As we have said, the government points to numerous historical taxation and registration regulations suggesting §5861(d) fits within the historical tradition of firearms regulation. Setting aside the historic analogues cited by the government to carry its burden, the government could have also cited to laws enacted around the time of founding, which prescribed fines, taxes, or sureties on gun possession or use for violence prevention purposes. For instance, a 1759 New Hampshire law called for the arrest and fine of those who "go armed offensively" and allowed justices of the peace to "commit the offender to prison, until he or she finds such sureties for the peace and good behavior...."[7] A 1763 New York law condemned carrying or shooting any "Musket, Fowling-Piece, or other Fire-Arm whatsoever" in certain areas of "New York [City] or the Liberties thereof, without [a] License in Writing first ... and ... he, she, or they so offending, shall ... forfeit and pay ... the Sum of Twenty Shillings" per offense.[8] Southwark (present-day Philadelphia) passed laws in 1774 and 1794 that imposed fines (e.g., "the sum of ten shillings")

---

[7] An Act for Establishing and Regulating Courts of Public Justice Within this Province (1759), *in* ACTS AND LAWS OF HIS MAJESTY'S PROVINCE OF NEW HAMPSHIRE, IN NEW ENGLAND 1–2 (1761).

[8] Act of Dec. 20, 1763, *in* LAWS OF NEW-YORK, FROM THE YEAR 1691, TO 1773 INCLUSIVE 441–42 (Hugh Gaine ed., 1774).

for discharging a firearm within a certain distance of any building, and later, "within the regulated parts of the district, without the permission of the president of the board of commissioners[,]" respectively.[9] These are but a few illustrations. Surety statutes both generally presumed that individuals had a right to public carry, *Bruen*, 597 U.S. at 56, yet also "provided a mechanism for preventing violence before it occurred...." *Rahimi*, 602 U.S. at 697.

Finally, the government asserts that historical analogues exist for regulating dangerous and unusual weapons, like short-barreled rifles. At common law, for example, a person was prohibited from "arm[ing] himself with dangerous and unusual weapons, in such a manner as w[ould] naturally cause a terror to the people...." *State v. Langford*, 10 N.C. 381, 383 (1824). "[G]oing armed" laws prohibited "riding or going armed" with "dangerous or unusual weapons" because it disrupted public order and led "almost necessarily to actual violence." *Rahimi*, 602 U.S. at 697 (recognizing that prohibitions on going armed existed at English common law and were incorporated into American jurisprudence) (cleaned up). These historic laws mirror the NFA in their purpose. One of the NFA's very objectives is "to regulate certain weapons likely to be used for criminal purposes, just as the regulation of short-barreled rifles, for example, addresse[d] a concealable weapon likely to be so used." *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992) (plurality opinion).

---

[9] *See* Act of Dec. 24, 1774, *in* ORDINANCES OF THE CORPORATION OF THE DISTRICT OF SOUTHWARK, AND THE ACTS OF THE ASSEMBLY RELATING THERETO 49–50 (1829); *see also* Act of Sept. 22, 1794, *in* ORDINANCES OF THE CORPORATION OF THE DISTRICT OF SOUTHWARK, AND THE ACTS OF THE ASSEMBLY RELATING THERETO 51 (1829).

We turn, as we must, to the "how" and "why" of historical regulations versus the "how" and "why" of §5861. There are striking similarities between the animating principles behind historical regulations and §5861. We set aside the debate on how to divine *why* a legislature acted for another day. For our present purposes, it is enough to say that since before our founding, continuing through the lives of the founding generation, and even lasting until today there has stood an unbroken line of common sense regulations permitting our duly elected representatives to limit weapons where the likely use for the weapon is a violent breach of the peace. Such is the unmistakable purpose of surety laws, riding while armed limitations, and the long-recognized need to place dangerous and unusual weapons in a category of their own. Applying this to §5861 yields a clear result. The NFA regulates rifle barrel length because a short-barreled rifle's concealability coupled with its "heightened capability to cause damage" make the weapon more appealing to those who intend to wield the firearm for unlawful use. *United States v. Cox*, 906 F.3d 1170, 1185 (10th Cir. 2018) (quotation omitted); *see also Thompson/Ctr. Arms Co.*, 504 U.S. at 517 (plurality opinion).

And, §5861 is merely a taxing statute, so just as the "why" regulates firearms with characteristics uniquely suitable for criminal purposes, the "how" of the regulation has little impact on lawful possession for armed self-defense. Section 5861 does nothing to offend the Constitution that has stood as a bulwark between the people and governmental overreach for centuries. It simply makes those who desire a weapon likely to breach the peace register that weapon and pay a tax.

Rush insists that short-barreled rifles are not dangerous and unusual, and that they were not only in common use

during the Founding Era but remain common today.[10] In support, he cites various secondary sources describing types of short-barreled weapons in use as early as the 1800s in England and during the American Revolution. He also cites statistics that he believes demonstrate the widespread use of short-barreled rifles today. A Bureau of Alcohol, Tobacco, Firearms and Explosives statistic cited by Rush states that there were 532,725 registered short-barreled rifles in the United States in 2021.[11]

But we have previously rejected this type of commonality reasoning. *See Bevis*, 85 F.4th at 1198–99 ("[W]e decline to base our assessment of the constitutionality of these laws on numbers alone. Such an analysis would have anomalous consequences."); *see also Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015). In *Friedman*, we acknowledged that the Thompson submachine gun, for example, was notoriously common in Chicago during the Prohibition era but explained that its popularity did not afford it constitutional immunity from the federal prohibition enacted under the NFA. 784 F.3d at 408–09.[12] More critically, Rush says nothing of what short-

---

[10] We address commonality on step two without deciding which *Bruen* step it falls within. *See Bevis*, 85 F.4th at 1198 ("There is no consensus on whether the common-use issue belongs at *Bruen* step one or *Bruen* step two.").

[11] We note that the *Bevis* plaintiffs seeking to strike down an assault weapons ban asserted in their briefing that there were at least "20 million AR-15s and similar rifles" owned by "some 16 million citizens." *Bevis*, 85 F.4th at 1198. That alleged figure could not save the day in *Bevis*, and likewise, Rush's figure (nearly thirty-eight times smaller) cannot save his Second Amendment challenge here.

[12] In *Bevis* we explained that our reasoning in *Friedman* was "basically compatible with *Bruen*" because that decision "anticipated the need to rest

barreled rifles are commonly used *for*. Second Amendment protection, of course, extends only to those firearms in common use for a lawful purpose like self-defense, not to any prolific firearm. *See Rahimi*, 602 U.S. at 690 (discussing Second Amendment right as the right to armed "self-defense"); *see also Bianchi*, 111 F.4th at 460 (applying *Bruen*, stating, "[j]ust because a weapon happens to be in common use does not guarantee that it falls within the scope of the right to keep and bear arms.").

In all, the government's historical analogues for barrel-length regulations, registration and taxation requirements, as well as regulations of dangerous and unusual weapons are compelling. With this backdrop, we easily answer the only question at issue for this appeal: does *Bruen*'s two-step test—or any other Supreme Court holding for that matter—overrule *Miller*? We see no basis to recognize *Miller* as overruled. Section 5861(d) is likely "relevantly similar" to these historical regulations in both why and how it burdens any Second Amendment right such that it "pass[es] constitutional muster." *Bruen*, 597 U.S. at 30; *Rahimi*, 600 U.S. at 698. Indeed, §5861(d) imposes a comparable burden to its historic counterparts, and in some cases, a lesser one, requiring mere registration of an otherwise lawful firearm. *See Rahimi*, 600 U.S. at 698 (finding the challenged provision was "by no means identical to these founding era regimes" but that "it does not need to be" (citing *Bruen*, 597 U.S. at 30)). Further, the penalty,

the [Second Amendment] analysis on history, not on a free-form balancing test." 85 F.4th at 1089–90. Regardless, for our purposes here, we cite *Friedman* simply for its observation that a firearm's popularity in contemporary times has little jurisprudential value, on its own, in a "commonality" analysis. 784 F.3d at 409.

potential imprisonment only after failing to register and pay-ing applicable taxes, likely also fits within the regulatory tra-dition of the going armed laws and those imposing fees, taxes, or fines. *See id.* at 699.

We are left with the conclusion that *Miller* survives *Bruen*. We also recognize that "the constitutional issues at stake are weighty." *Atkinson v. Garland*, 70 F.4th 1018, 1023 (7th Cir. 2023). Therefore, while we meet our duty to address argu-ments raised directly by the parties, we also deem it appro-priate to decide this case on the simple fact that *Miller* con-trols. *See, e.g.*, *Pantoja v. Portfolio Recovery Assocs., LLC*, 852 F.3d 679, 684 (7th Cir. 2017) (deciding case on narrower grounds); *Fessenden v. Reliance Standard Life Ins. Co.*, 927 F.3d 998, 1003 (7th Cir. 2019) (same). The district court correctly held that §5861(d) is constitutional and appropriately denied Rush's motion to dismiss the superseding indictment.

### III.    Conclusion

For the reasons set forth, we AFFIRM.